This is a suit brought by Captain Norris G. Storey against Wesley G. Parker, a resident of California, and the A.-C. Service Station, Inc., of Baton Rouge, in which he seeks to obtain judgment against both defendants, in solido, in the sum of $50,586.36 for damages for personal injuries sustained by him when he was run over by an automobile belonging to Parker and which had just been left with the Service Station for oiling and greasing and other attention.
The undisputed facts may, as briefly as possible, be stated as follows: Parker, who lives in Los Angeles, California, after having had a new model Oldsmobile demonstrated to him by a local dealer, agreed to purchase one, delivery to be made at Lansing, Michigan. Accordingly, he and Mrs. Parker went to Lansing, took delivery of the car and proceeded from there on a trip which took them through several eastern and southern States until they reached Baton Rouge, where Mr. Parker decided that it was time to have the car greased and oiled and the oil in the crankcase changed. He used Texaco products and noticing a sign advertising them at the A.-C. Service Station at the northwest corner of Lafayette and Florida Streets, drove into one of the lanes of the driveway, stopping his car near the gasoline pumps which stand on a small raised concrete platform separating the two lanes of the driveway. The driveway runs diagonally across the east end of the station, entrances opening on both Lafayette and Florida Streets. While right at the place where the pumps are located, the floor is level, there is an incline or gradual slope on both ends. Mr. Parker entered on the west side lane of the driveway, and right at the left of that lane, abutting the side walk on Florida Street, is a concrete column supporting that end of the building.
The Parker car was equipped with what is referred to as hydra-matic drive which is a combination of a high-efficiency liquid coupling and a fully automatic transmission. It eliminates gear shifting and pressing of the clutch. It had been fully tested but may be said to have been something of an innovation in the operation and driving of an automobile at the time the accident we are concerned with happened.
As Mr. Parker brought his car to a stop he inquired of the station manager, D.L. Price, how long it would take to attend to what he wanted done to his car, and upon being told that it would require about an hour, he got out, walked around to the other side and assisted his wife in getting out also. He had not turned his motor off however and neither did he shift the direction control lever which, at that time, was in the position referred to as "Hi". Besides Price, there were two negro attendants near the car at the time waiting to get the order which Price had to write out on a pad, taken from the office immediately adjoining the driveway, for what the *Page 90 
service would be. Neither to Price, nor to the two attendants did Parker convey any information whatsoever that his car was equipped with hydra-matic drive or that he had left the motor running with the direction control lever in "Hi".
A very short moment after Mr. and Mrs. Parker had left the car standing in the driveway, probably a minute or so, it started to move without anyone being in it. One of the negro attendants, John Cooper, had placed his hand on the door knob to open it but the car was in motion before he could do so. As it moved forward, he jumped on the running board endeavoring to get his hand inside in an effort to turn off the ignition switch, but the speed of the motor accelerated and the car moved on faster. The negro boy was knocked off as it brushed by the concrete column on its left side and from there moved forward into Florida Street, running over the plaintiff and finally landing across the street where the motor was killed after it had struck another car parked on that side.
Plaintiff claims that the accident and his resulting injuries, which were severe, was due to the negligence of both defendants. Negligence is charged against Parker in two respects: (1) In driving a car equipped with hydra-matic drive which is an innovation in automobiles with which neither the general public nor the general run of automobile mechanics and service station employees are familiar, and in leaving it standing with the motor running and the direction control lever in "Hi" when there is danger of a car so equipped starting and continuing to move forward of its own accord provided the control lever is left in any position other than neutral; and (2) in failing to inform any of the service station attendants that his automobile was fitted with such an equipment, which it was his duty to do, particularly as hydra-matic driving is an innovation which has not been perfected to the extent where reliance can safely be placed on its performance in the manner in which it is supposed to perform. The negligence charged against A.-C. Service Station, Inc., is that its employees permitted the motor of the automobile to continue to run and the direction control lever to remain in "Hi" while the car was unattended by any one in a position to control the same. It is further charged that John Cooper, the negro attendant, was negligent in grasping and pulling the throttle of the car which caused its speed to greatly accelerate after it started to move, for which negligence his employer is legally responsible.
Both defendants denied that they were guilty of any negligence which caused or contributed to the accident. The A.-C. Service Station, Inc., pleaded in the alternative that plaintiff was guilty of contributory negligence which barred his recovery. This plea, however, is no longer being urged and we assume that it has been abandoned. The defendant Parker called in warranty the General Motors Sales Corporation, manufacturer of his Oldsmobile automobile, to which call an exception of no cause of action was filed and later overruled. Answer was then filed in which it is denied that there were any defects in the automobile for which the manufacturer could be held liable for damages growing out of the accident which was alleged to have happened.
Although plaintiff did not specially allege it in his petition, he invoked in both the district court and in this court, the rule of res ipsa loquitur.
After a lengthy trial in the district court, judgment was rendered in favor of the plaintiff against both defendants, in solido, in the sum of $10,574.29. The call in warranty against General Motors Sales Corporation was dismissed. Both defendants have appealed and plaintiff has answered the appeals asking for an amendment of the judgment by increasing it to the sum of $15,574.29.
There is no doubt that Mr. Parker had been fully informed in regard to the hydra-matic drive on his new automobile. He had driven a demonstration car equipped with it, in Los Angeles, had been instructed at the factory and had available all the written instructions concerning the same. Among others, these instructions called particular attention to what was to be done in stopping the car. Specifically it is stated under paragraph (2): "To stop the car, release the accelerator and step on the brake. It is not necessary to change the position of the control lever to make a temporary stop. However, if the car is parked with the engine running, always move the control lever to `N', as even a slight pressure on the accelerator will start the car in forward motion when the control lever is in `Hi'." The same instructions were printed on a card on the sun-vizor directly in front of the driver's seat and on the steering wheel, the four *Page 91 
slots for placing the direction control lever in position are clearly identified and designated on a plate as follows: "N. Hi, Lo., R." Notwithstanding his experience and all these instructions, cautions and warnings, when Mr. Parker drove into the service station on the morning of the accident he admittedly got out of the car leaving the motor running and the direction control lever in "Hi". Neither, as he admits, did he inform the service station manager or any of the attendants, that his car was equipped with hydra-matic drive and that he had left the motor running and that the control lever was in "Hi". From that moment on, instead of ourselves elaborating on the facts heretofore mentioned, we take the liberty of quoting from the written opinion of the learned district judge who has carefully and studiously analyzed the testimony found in the record:
"D.L. Price, Service Manager of the A.-C. Service Station, testified that when Parker drove into the filling station, he took his order, which was to grease the car and change the oil. Parker said nothing to him about the car being equipped with the hydramatic drive. Just before the accident, the car was sitting in the inside driveway of the filling station, headed toward Florida Street, which runs east and west and which is south of the station. After Parker gave his order, he and his wife left for lunch, leaving the car standing still. At that time, Price says he does not know whether the motor was running or not.
"After Parker told him what he wanted, Price says he (Price) stepped into the office door and reached for a card upon which to write the order. Just as he was about to write the order he heard the motor of the car `race up' and he saw it `leaving out' with no one in it. About that time John Cooper, one of the colored employees, jumped on the car. It seemed that he was trying to do something to stop it, but he did not do so. By that time the motor was running real fast. Proceeding toward Florida Street, the car ran out of the station, hitting the center concrete post in the middle of the driveway and knocking John Cooper off. The car then bounced back, and then headed out toward the street and toward another car. As it started toward this other car, it was at a slant. In some way it cut away from this other car and ran over Captain Storey who was out along the edge of Florida Street.
"Price stated that Mr. and Mrs. Parker had hardly had time to get across Florida Street when the Parker car began to move, and that no one had gotten in the car.
"According to this witness, the negro Cooper, did not put his hand inside the car before it began to move, although he may have done so after it started forward. Price testified concerning other details of the accident which will hereafter be referred to.
"John Cooper, the colored boy, with respect to the accident, said:
"`Well, I was coming out of the storage door when Mr. Parker drove in the north end drive of the service station and I walks up, stood on the north side of Mr. Price waiting on orders from Mr. Price. We are not supposed to touch a car until we are told by him what to do. Mr. Parker told Mr. Price that he wanted his car greased and the oil changed, and Mr. Parker got out of the car on the left hand side, goes around and assisted Mrs. Parker out on the right hand side, then shut the door. Both doors was closed. Then he asked Mr. Price where he could go and have lunch. Mr. Price directed them where they could go for lunch and Mr. Price went in the office to get a sales, slip to make out the order and put on the windshield, so we would know what department to take it in and when he went to put the slip on the windshield he said, "Take it to the grease rack" and I grabbed the door knob to turn the handle to get in the car and I didn't turn it far enough to open the door and I pulled on it at the same time and it started moving off.'
"As the car started off, he said:
"`I held my grip on the handle because I was too close between the car and the aisle — If I had turned loose it would have knocked me down and ground me up. As it went off it picked up faster and faster. Then I gripped it tighter and jerked myself with one hand, elbow and toes. My mind told me to try to cut the ignition off. When I went to raise my right arm, I was hit by the post. What happened afterward, I don't know.'
"Cooper testified positively that no one had done anything to cause the car to start off. He also said that he never did reach inside the car and particularly did he deny that he ever pulled out the throttle.
"John Fulton, another colored filling station attendant, testified that he was engaged *Page 92 
for the purpose of serving cars, and that he had worked for the A.C. Service Station for about a year before the accident. He also testified that he was not acquainted with automobiles equipped with the hydramatic or fluid drive, and particuly denies that he knew that Parker's car was thus equipped.
"As to the accident, he said:
"`I don't know just how long the car had been in the west side of the drive. I was in the west end of the building fixing a flat tire, and after I finished fixing the flat tire I came to the side door which led out into the west drive of the service station, and in walking out in the drive this Oldsmobile was parked in the north end of the drive near the office door. I walked straight up the middle of the aisle facing this car. I met Captain Storey between the door that I came out of and the automobile that was parked in the drive. I walks up then to the front of the car, put my left foot on the bumper and my right elbow on top of the hood. * * * I asked Mr. Price what was to be did to the car, He said he was going to grease it and change the oil in it, and Mr. Price was standing on the West side of the car with a pad in his hand writing down what was to be did to the car, and the car began to move off slowly. I made one or two jumps backwards to try to hold the car. * * * As it began to push harder toward me I hollered to Cooper to jump on the running board and try to stop it, and I just practically muscled myself from the aisle that the car was in across on top of the island between the cabinet and the pump. When I jumped over there, I jumped backward over there, and in looking around the direction the car was going I seen Captain Storey.'
"He was asked:
"Where was he then?
"He answered:
"`Just out at the edge of the building and I hollered to him "Look out, there comes a loose car" and just about the time I said that he turned when I hollered, he turned half around, and the left front fender of the car hit the side of the concrete column at the south end of the building, and in hitting this post it picked up Captain Storey at the same time and carried him across the street, hit the car that he had rented, goes on across the street and hits a car parked against the curb on the south side of Florida Street, and that knocks him off. He fell down at the end of the bumper practically in front of the car, the Oldsmobile. It rolled back, about half way back across the street, then goes back and hits the same car before the motor killed.'
"This witness testified that the doors of the Parker car were never opened after he first saw the car. He further testified that if John Cooper ever put either hand on the Parker car he did not see him, although he was in a position to see him if he had done so. He also testified that before the Parker car began to move he heard the motor running.
"J.A. Whitaker, who is now a Sergeant in the United States Army, but who at the time of the accident was a resident of Wilson, Louisiana, stated that he happened to be right near the filling station just before the Parker car started off, and that he noticed it before it started off. He differs from the other witnesses however, as to the driveway in which the Parker car was standing, stating that it was in the outside driveway, whereas the other witnesses testified that it was parked on the inside driveway.
"Whitaker stated that after he saw the car start off a colored boy who was working at the back ran around to the side of the car as though he was going to get in it, but the car was already rolling. He states that there was a big pillar right there and he couldn't open the door to get in, so he looked like he was reaching in to turn the ignition off, and the car seemed to have pinned him between it and the post.
"When Whitaker first saw the car he states that it was standing still and that no one was in it. He was a little uncertain as to exactly what happened after the colored boy was pinned between the car and the post, but states that he saw the car strike Captain Storey, and that he assisted Captain Storey, who was badly hurt.
"After they had taken the Captain to the hospital, Whitaker says he walked over and looked in the car and noticed that the throttle was pulled out on the dashboard. He further stated that when the car first began to roll it rolled slowly, but that it picked up speed very rapidly.
"Whitaker also stated that when he saw the negro boy jump on the side of the car it looked to him as though the negro was going to get inside of the car, but that he decided he couldn't make it and that he reached inside, but what he did inside, if *Page 93 
anything, he did not know. This was before the car hit the post. The witness however is positive that before the car began to move he had seen nobody trying to do anything to it such as moving it, driving it or attempting to turn a switch or anything of that kind.
"Aside from the fact that one of the witnesses, Whitaker, seemed to believe from what he saw, that John Cooper, the colored boy, put his hand inside the car, after it started to move in an effort to stop it, with the inference that he may have pulled out the throttle, there is very little difference in the testimony of the eye witnesses in the case.
"Just what caused the Parker car to move, no one knows definitely. That it did move, however, with no one in it, and that it did run out on the street and strike Captain Storey, there can be no doubt."
As every cause produces an effect, it follows that every effect must have a cause. The primary effect with which we are concerned in this case is the moving of the automobile forward without which there would have been no accident. Therefore we have to look for and find the cause of its moving forward. In law, where more than one cause may exist, we must go further and find out which, if any, was the efficient or the producing cause, or the one which, without any intervening cause was sufficient, and not being able to do this, we must then go further and find out if two or more of the other causes, together, contributed in producing the effect. Here, the questions that are directed to the Court may be stated as follows: Was the leaving of the motor of the automobile running with the directional control lever in "Hi" after the driver and the other occupant had both gotten out, the cause for which, without any other, the car started to move forward, or was anything that was done by any of the attendants of the service station, or anything which they may have failed to do, a cause which, whether of itself also, or as a contributory cause, put the car in forward motion?
Mr. H.N. Metzel, experimental development engineer of the General Motors Sales Corporation at Lansing, Michigan, was produced as an expert witness by that corporation in defense to the call in warranty. He is thoroughly familiar with the hydra-matic drive on an Oldsmobile automobile, having assisted in its development. After describing what it is in technical and mechanical detail, he then discusses in his testimony, how it acts and how it should be operated. From his description, we understand that the force that is to be applied to the transmission, which has no shifting gears, is accomplished by oil pressure which is controlled from a hand operated valve connected to the selector lever at the driver's finger tips. If the control lever has to be in one of the positions indicated on the steering wheel, to have force transmitted in order to drive the car either forward or backward, it follows that no such force will be applied producing motion in the car when the lever is in the neutral position. For that reason, Mr. Metzel states that when the car is left unattended, with the engine running, the control lever should be in neutral just as the printed instructions direct. Further, however, he was asked, if the lever is left in "Hi" with the engine running, the car standing on level ground, without the hand brake being set, would it be likely to move forward, to which he answered: "I would say it would be impossible to move forward if the car was standing still with all of the conditions mentioned; * * * in that condition it then requires either throttle opening or some outside force, a push, to move the car; it will not pick up by itself."
To the lay mind this may seem to be little inconsistent with his statement regarding the application of force through a hand operated valve connected with the selector lever being necessary to put the car in motion, and also with his own, as well as the instruction card warning, that when the car is left unattended with the engine running, the lever should always be in neutral. We can not help but feel, therefore, that Mr. Parker's action in leaving the lever in "Hi" with the motor running, while no one was in it, was a producing cause of the car moving forward. Had he followed the simple instruction to put the lever in neutral, or even more simply yet, had he turned his motor off, either of which two things we feel that any reasonably prudent man would have done under the circumstances, there would have been no accident.
But let us for the moment indulge the theory that even with the lever in "Hi", it would have been impossible for the car to move forward, unless there was an opening of the throttle or some outside force, such as a push, applied, to cause it to move, *Page 94 
both of which, of course, would involve a producing cause on the part of the employees of the service station, and what do we find in the record to warrant the conclusion that either of these things occurred? The only contact any of these employees had with the car was John Cooper's taking hold of the door knob to open it, and another attendant leaning against the front end with one foot on the bumper and an elbow on top of the hood. There is some testimony to the effect that in his attempt to stop the car, Cooper may have pulled the throttle out. But if he did anything like that, it was after the car had already started to move forward, and would have had nothing to do with putting it in motion. We can hardly believe that either of the other two contacts mentioned was sufficient outside force to cause the car to move forward. Neither would have had anything to do with feeding gasoline to the carburetor, the only way, Mr. Metzel says, that it could have started in motion under its own power. Hence we conclude that neither was a producing or a contributing cause of the car moving forward and therefore the direct and the proximate cause was the leaving of the control lever in high by Mr. Parker while the motor was kept running and without the hand brake having been set.
Having determined what the proximate cause of the effect which produced the accident was, and that Mr. Parker was negligent in his actions in relation to that cause, the next question to be inquired into is whether there was any negligence on the part of the service station employees, regardless of the cause which set it in motion, which may have contributed to the accident. The district judge found that there was negligence on their part, (1) in not observing that the motor was running, (2) in doing something that caused the car to move forward, and (3) in pulling out the throttle, thus feeding gasoline to the carburetor. The district judge admits that these conclusions were based principally on circumstantial evidence.
It is our opinion that the alleged specific acts of negligence charged against the employees of the service station by the plaintiff, and as found by the trial judge, were not proven by competent evidence, which burden had to be borne by the plaintiff. Under the facts as we find them, Mr. Parker, although stating that at the several service stations where he had stopped before, he had told the attendants that his car was equipped with hydra-matic drive, admits that he made no mention of it whatever to the manager in charge of the A.-C. Service Station, and since no unusual circumstance was communicated to either the manager or to any of the attendants, we do not think that it can be said to have been negligence on their part to have left the car standing, with the motor running, for a moment, awaiting its transfer to the department in which it was to be serviced. It is also admitted that no one connected with the station got in the car and had the opportunity to observe the signs that it was equipped with hydra-matic drive, an equipment which although thoroughly tested and approved may still be said to have been somewhat of an innovation in automobiles at that time. Since therefor no knowledge whatever can be attributed to the employees of the service station, that the control lever was in "Hi", it cannot be said that they were negligent in leaving it in that position. As already indicated, the proof is not sufficient to show that any of this defendant's employees did anything which caused the car to move forward, and lastly, we find no direct or positive proof that the attendant, John Cooper, pulled out the throttle, as it was discovered that the throttle was pulled out only some ten or fifteen minutes after the accident had happened, and when, it was shown, that a great many people had already congregated at the scene. But even were it conceded that in his effort to prevent an accident, Cooper, by mistake, touched the throttle instead of the ignition switch, which he says "his mind" told him to turn off, unquestionably he was faced with a sudden emergency and could not be held to the conduct of a reasonably prudent and careful man acting under normal circumstances. It would hardly be fair to hold a person guilty of negligence where it appears that his alleged act of negligence was prompted by a desire to prevent the happening of the accident complained of and in which he himself was injured.
The only other theory upon which this defendant could be held liable would be by the application of the doctrine of res ipsa loquitur. But can this doctrine be applied in a case where, as here, we have already concluded that another's negligence was a proximate cause of the accident? Blashfield, in commenting on the rule, in his Cyclopedia of Automobile Law *Page 95 
and Practice, Vol. 9, Section 6046, states that it "will not be applied where the evidence discloses that the injury might have occurred by reason of the concurrent negligence of two or more persons or causes, one of which was not under the management and control of the defendant;" and further that "It is only where the circumstances leave no room for a different presumption that the above maxim applies. It does not apply in any case where there is direct testimony as to the cause of the accident."
In construing the rule, the Supreme Court, in the case of Morales v. Employers' Liability Assurance Corporation, Ltd., et al., La.Sup., 12 So.2d 804, decided within the last few weeks and not yet reported, stated as follows: "It is the duty of the plaintiff to prove negligence affirmatively; and, while the inference allowed by the rule of res ipsa loquitur constitutes such proof, it is only where the circumstances leave no room for a different presumption that the rule applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails and it can not be invoked. Quass v. Milwaukee Gas Light Co., 168 Wis. 575, 170 N.W. 942; Klein v. Beeten, 169 Wis. 385, 172 N.W. 736, 5 A.L.R. 1237."
So far as the call in warranty made on the General Motors Sales Corporation is concerned, it need only be noted that plaintiff did not allege in his petition that the car which Mr. Parker was driving was defective and neither did he attempt to prove that that was true. The testimony is to the contrary. Without doubt, in our opinion, the call was properly dismissed.
The remaining question to be considered is that of the amount of damages plaintiff is entitled to recover.
That they were severe and aggravated, there is no doubt, and unquestionably, also, he suffered much pain and discomfort. The district judge awarded him $10,000 for his injuries, pain and suffering, and $574.29 for medical, hospital and other expenses incident to his treatment. We have concluded that he is entitled to recover a very substantial sum but are of the opinion that inasmuch as he seems to have recovered entirely and is able to carry on his vocation as a steamboat pilot in the same manner as he did before, the amount allowed is a bit high, and it will therefore be reduced.
Plaintiff was knocked down and dragged halfway across the street. He sustained a complete fracture of the neck of the left scapula; multiple deep lacerations of the right forehead, close to the right eye, also of the nose and face, of both hands and forearms, and both legs. He also sustained a fracture of the navicular bone of the right wrist and a posterior dislocation of the right ulna at the wrist. Finally, he suffered general contusions and brush burns about the body and severe shock. The treatment of the wounds and lacerations in order to prevent the spread of infection delayed the immobilizing of his fractured shoulder and wrist and his consequent recovery. Notwithstanding the number and severity of his injuries, the fact is that within four months from the date of the accident, he was certified by his physician as being able to go back to work and has been working ever since. The fact also is that he has lost very little, comparatively speaking, in the way of salary.
Plaintiff complains of impaired sight because of the injury to his right eye but we do not think the proof sustains his complaint. It is true that he has to wear eye glasses but apparently he has reached that age when it becomes necessary for almost every one to begin wearing them. The only resulting effect from his eye injury may be said to be a twitching which is accompanied by a rather unusual clicking sound, produced probably by a retraction of scar tissue, which no doubt is a disagreeable thing to have.
Plaintiff also complains of impaired hearing, but the medical proof fails to show any evident injury to the ear drums and the most that can be said on this point is that, like so many people, he is slightly deaf. Whether his injury had anything to do with that condition or not, is by no means certain.
The most serious condition he has been left with is a state of nervousness which no doubt results from the severe shock he experienced. However, this does not seem to interfere with the performance of his work as a master pilot and neither does it seem to have been taken into account in passing at least one of the physical examinations he is required to undergo periodically to hold his job with his employer.
As already stated, we are of the opinion that the award of $10,000 for his injuries, pain and suffering and for his resulting disabilities is a bit excessive and *Page 96 
have concluded to reduce it by the sum of $2,500. The judgment will, accordingly, be amended in that respect and will be reversed in so far as it condemns the defendant A.-C. Service Station, Inc., in solido, with the defendant, Wesley G. Parker.
For the reasons stated, it is now ordered that the judgment appealed from, in so far as it condemns the defendant, A.-C. Service Station, Inc., in solido, with the defendant, Wesley G. Parker, be and the same is hereby reversed, avoided and set aside, and it is now ordered that plaintiff's demand as against the said A.-C. Service Station, Inc., be rejected and denied.
It is further ordered that the said judgment, in so far as it condemns the defendant, Wesley G. Parker, be and the same is hereby amended by reducing the amount of the award from the sum of $10,574.29 to the sum of $8074.29, and that as thus amended, it be affirmed.
It is ordered that all costs incurred in the district court be paid by the defendant, Wesley G. Parker, appellant herein, and that the costs of this appeal be borne by the plaintiff, appellee. *Page 105