787 So.2d 283 (2001)
Rodney HENDRICK
v.
ABC INSURANCE COMPANY, DEF Insurance Company, XYZ Insurance Company, et al.
Nos. 2000-CC-2403 and 2000-CC-2349.
Supreme Court of Louisiana.
May 15, 2001.
Rehearing Denied June 29, 2001.
*284 James A. Brown, Jana L. Grauberger, John M. Wilson, Liskow & Lewis, New Orleans, Counsel for Applicant (No. 00-CC-2349).
James C. Percy, Baton Rouge, Robert R. Percy, III, Timothy E. Pujol, Charles H. Braud, Jr., Richard P. Ieyoub, Baton Rouge, Counsel for Respondent (No 00-CC-2349).
James C. Percy, Baton Rouge, Robert R. Percy, III, Timothy E. Pujol, Baton Rouge, Counsel for Applicant (No. 00-CC-2403).
James A. Brown, Jana L. Grauberger, John M. Wilson, Liskow & Lewis, New Orleans, Charles H. Braud, Jr., Richard P. Ieyoub, Baton Rouge, Counsel for Respondent (No. 00-CC-2403).
KNOLL, Justice.
Before this Court is a legal malpractice claim filed by Rodney Hendrick ("Hendrick") against Stone, Pigman, Walther, Wittmann & Hutchinson, John M. Landis, Randall A. Smith, William E. Brown, and Attorneys' Liability Assurance Society, Inc. (collectively "Stone Pigman"). Based on the record before us and the law, we find that Hendrick's claim against Stone Pigman prescribed under the law in effect before the enactment of LA.REV.STAT. ANN. § 9:5605.[1]

*285 FACTS AND PROCEDURAL HISTORY
Hendrick worked for Herb Polk ("Polk"), Hendrick's father-in-law, at Polk's car dealership in Baton Rouge and became involved in a business deal with Polk in South Carolina. Polk, James Fink ("Fink"), Francis Collins ("Collins") and Hendrick formed a corporation named PFC, Inc. d/b/a Stingray Boat Company ("Stingray"). Polk, Fink, and Collins each had a 30% interest and Hendrick had a 10% interest in Stingray when it was formed. The ownership interests changed when additional shares of Stingray were issued at a 1981 shareholders' meeting. Polk's interest increased to 59%, Fink and Hendrick retained their percentage interest at 30% and 10% respectively. Collins' interest, however, was reduced to 1% after the new shares were issued.
Hendrick and Judith Polk were divorced in April 1983. Soon thereafter, Hendrick was replaced on the board of directors of Stingray. Collins filed suit against Hendrick, Polk and Fink in South Carolina and in the Middle District of Louisiana and alleged irregularities and improprieties at the 1981 shareholders' meeting when Collins' interest in Stingray was diluted. See Collins v. PFC, Inc., No. 83-16-570 (S.C. Ct. Com. Pleas, Darlington 1983); Collins v. Polk, 115 F.R.D. 326 (M.D.La.1987). In November 1983, apparently due to the inability of Hendrick and Judith to resolve community property issues in their divorce, Hendrick filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code in Bankruptcy Court for the Middle District of Louisiana.
*286 Donald Starns ("Starns") was appointed the trustee to manage the debtor's estate. In the bankruptcy proceedings, both Starns and Hendrick were represented by counsel. David Rubin ("Rubin") represented Starns, and William Steffes ("Steffes") represented Hendrick. In the course of the bankruptcy proceedings, Starns filed an application with the bankruptcy court seeking authority to sell Hendrick's stock in Stingray.[2]
The bankruptcy judge conducted an adversarial hearing before deciding whether to approve the proposed sale. Hendrick filed an objection to the sale on the day of the hearing, alleging that the offered price of $150,000 was less than two-thirds the fair market value of the stock and the $150,000 offer was far less than the price paid for Polk's and Collins' stock. Starns, his attorney Rubin, Steffes, Fink, and an attorney for Judith Polk were all present at the hearing. Rubin expressed concerns whether the proposed offer reflected the value for the shares that other shareholders had received, but maintained that the stock sale should be approved. The bankruptcy judge approved the sale. The Bankruptcy Court's order authorized the sale of the Stingray stock "free and clear of all liens, claims, and encumbrances, including any and all alleged co-owner's rights or right of first refusal of Judith Polk Hendrick." This signed order contrasts with a minute entry of February 13, 1985, in which the court directed the trustee to continue to investigate the stock transaction and "bring an action to recover claims on behalf of the estate if any is found to exist." Neither Rubin nor Steffes appealed the order. Neither Rubin nor Steffes filed a motion for clarification to correct the discrepancy between the order and the minute entry. The bankruptcy estate not only received money for the sale, but also was dismissed from all liability associated with the Stingray stock, namely the Collins lawsuit.[3] After the hearing, Hendrick's stock was delivered to Fink with the name of the purchaser left blank.
The day after the hearing on the sale, February 14, 1985, Starns filed a supplemental application for authority to employ special counsel to investigate the circumstances surrounding the offer received by the trustee for the purchase of the Stingray stock. Pursuant to a court order, Starns, as trustee for the debtor's estate, hired Stone Pigman as special counsel on April 19, 1985. Stone Pigman was charged with investigating the circumstances related to the sale of Hendrick's Stingray stock and the "institution of any necessary litigation" regarding the matter.
Investigation by Stone Pigman revealed alleged fraud perpetrated by the purchasers of the Stingray stock. Stone Pigman subsequently filed suit on February 12, 1986, and asserted fraud claims under the Racketeer Influenced and Corrupt Organizations Act, the Securities Exchange Act, and state law claims (collectively the "RICO suit"). Stone Pigman not only signed the complaint as attorney for *287 Starns, the trustee, but also as Hendrick's attorney. Defendants in the RICO suit raised defenses of res judicata and collateral estoppel based on Hendrick's failure to appeal the February 13, 1985, order that authorized the sale of the stock. The federal district court hearing the RICO suit advised the parties of its ruling dismissing the RICO suit on December 2, 1988, and issued its written judgment on January 24, 1989. See Starns v. Avent, 96 B.R. 620 (M.D.La.1989), aff'd sub nom. Hendrick v. Avent, 891 F.2d 583 (5th Cir.), cert denied, 498 U.S. 819, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990). The dismissal of the RICO suit on res judicata and collateral estoppel grounds raised questions as to whether counsel involved in the sale of the stock should have appealed or sought clarification of the February 13, 1985 order and whether Stone Pigman should have filed a Rule 60(b) motion[4] under the Federal Rules of Civil Procedure to insure that the order reserved rights to assert the claims set forth in the RICO suit.
The record shows that Hendrick was intimately involved in the RICO suit and that Stone Pigman kept Hendrick abreast of the posture of the case. Steffes, Hendrick's bankruptcy attorney, was aware *288 that Hendrick attended meetings with Stone Pigman attorneys, was informed of the RICO suit proceedings, and received a copy of the complaint that set forth the RICO claims. Hendrick has a doctorate degree, he taught college courses, and during his tenure as general manager of Polk Chevrolet, the business sold over three thousand new cars per year, over a thousand more cars per year than Hendrick's predecessor had sold. Hendrick had an ongoing attorney-client relationship with Steffes throughout the two year Chapter 11 bankruptcy.
Hendrick received a copy of the federal district court's judgment that dismissed his RICO claim and he discussed the judgment with Stone Pigman. Hendrick testified that Stone Pigman recommended that Hendrick should file appeals to see if "we can get it corrected." Hendrick also spoke to Steffes about the judgment. Steffes was, at that time, representing Hendrick, albeit on another matter. In December 1988, Steffes told Hendrick he had a malpractice claim against Stone Pigman based on a brief conversation with Hendrick in the halls of federal court.
On January 10, 1991, two years after gaining actual knowledge of a potential malpractice claim against Stone Pigman, Hendrick filed this malpractice claim which at that time included Steffes, Rubin, and Stone Pigman.[5] The trial court dismissed Rubin and Steffes from the suit by granting their exception of prescription. See Hendrick v. ABC Ins. Co., 95-1577 pp. 2-3 (La.App. 1st Cir.6/28/96), 677 So.2d 716, 718, writs denied, 96-2013 & 96-2136 (La.11/8/96), 683 So.2d 271, 272. The trial court held that Hendrick's claim against Stone Pigman had not prescribed and held in favor of Hendrick on the merits finding Stone Pigman 100% at fault. Stone Pigman appealed. The appeal was stayed and the case was remanded to allow Hendrick to amend his petition and argue that the retroactive application of LA.REV.STAT. ANN. § 9:5605 to his claim was unconstitutional. The trial court held that LA.REV.STAT. ANN. § 9:5605 was constitutional but that it did not apply to Hendrick's claim. Rather, the trial court applied the civil code articles regarding liberative prescription.
The appellate court affirmed the trial court on prescription by holding LA.REV. STAT. ANN. § 9:5605 did not apply to Hendrick's claim.[6] Relying on Marsh Engineering, Inc. v. Parker, 94-1129, p. 11 (La.App. 3d Cir.5/8/96), 688 So.2d 1042, 1048 writ denied, 96-1434 (La.9/27/96), 680 So.2d 637, the appellate court held LA.REV. STAT. ANN. § 9:5605 did not apply to Hendrick's claim because the Legislature did not clearly express its intent that the statute be applied retroactively until the 1992 amendments. Hendrick filed suit in January 1991 before the 1992 amendments; therefore, the Legislature's declaration came too late to bar Hendrick's suit. The appellate court, applying pre-La. Rev. Stat. Ann. § 9:5605 law, held that Stone Pigman's continuous representation of Hendrick suspended prescription until the representation ended with the United States Supreme Court denial of certiorari in the RICO suit in October 1990. The appellate court amended the trial court's *289 apportionment of 100% fault to Stone Pigman. The appellate court apportioned 30% fault to Steffes, 30% to Rubin, and 40% to Stone Pigman. Stone Pigman and Hendrick applied for writs, both of which we granted. See Hendrick v. ABC Ins. Co., 00-2349 & 00-2403 (La.11/17/00), 774 So.2d 153.
Since the beginning of this litigation, Stone Pigman has insisted that Hendrick's claim is prescribed. Stone Pigman argues that LA.REV.STAT. ANN. § 9:5605 should apply retroactively to bar Hendrick's claim. Hendrick, on the other hand, argues as the court of appeal held that LA.REV.STAT. ANN. § 9:5605 does not apply to Hendrick's action and that the continuous representation rule acted to suspend prescription until Stone Pigman ceased representing Hendrick in October of 1990. We find that under the law predating LA.REV.STAT. ANN. § 9:5605, Hendrick's claim is untimely because prescription was not suspended. LA.REV.STAT. ANN. § 9:5605 does not apply in this case because Hendrick's claims prescribed before its enactment and LA. REV. STAT ANN. § 9:5605 cannot breathe life into claims already prescribed. The lower courts were correct in that LA.REV.STAT. ANN. § 9:5605 does not apply, but fell into error when applying the continuous representation rule. We now discuss why Hendrick's claim against Stone Pigman is prescribed.

PRESCRIPTION
Central to the issue of whether Hendrick's legal malpractice claim has prescribed is the application of the equitable suspension doctrine of contra non valentem agere nulla currit praescriptio that encompasses the continuous representation rule as applied to suspend liberative prescription. Liberative prescription, one of the three types of prescription in Louisiana, bars a demand for enforcement of a legal right when there has been inaction for a period of time. See LA. CIV.CODE ANN. arts. 3445 & 3447; LA.CODE CIV. PROC. ANN. art. 421. Delictual actions are subject to a one year liberative prescription period that begins to run from the day the injury or damage is sustained. LA. CIV. CODE ANN. art. 3492. In the absence of an express warranty of result, a claim for legal malpractice is a delictual action subject to a liberative prescription of one year. Braud v. New England Ins. Co., 576 So.2d 466 (La.1991). "[F]or the prescriptive period to commence, the plaintiff must be able to state a cause of action both a wrongful act and resultant damages." Rayne State Bank & Trust v. National Union Fire Ins. Co., 483 So.2d 987 (La.1986). Prescription runs against all persons unless the Legislature provides an exception. LA. CIV.CODE ANN. art. 3467.
Despite the express statutory provision which evidences the clear intent of the Legislature to limit the instances when prescription does not run, we have long recognized the ancient civilian doctrine of contra non valentem agere nulla currit praescriptio which means prescription does not run against one unable to act. See Reynolds v. Batson, 11 La. Ann. 729 (1856); Corsey v. State, Through Dept. of Corrections, 375 So.2d 1319 (La.1979). Contra non valentem heralds from Roman law and has been passed down to us through our civilian roots. See G. BAUDRY LACANTINERIE & A. TISSIER, TRAITÉ THÉORIQUE ET PRATIQUE DE DROIT CIVIL, Vol. XXVIII Nos. 364-79 (4th ed. 1924), reprinted in 5 CIVIL LAW TRANSLATIONS at 191-202 (La. St. Law Inst. Trans. 1972); MARCEL PLANIOL, TRAITÉ ÉLÉMETAIRE DE DROIT CIVIL, Nos. 2697-2705(12th ed. 1939), reprinted in PLANIOL CIVIL LAW TREATISE, Vol. 1, Part 2 at 593-98 (La. St. Law Inst. Trans. 1959). French jurisprudence, like ours, recognizes contra non valentem. *290 See Corsey, 375 So.2d at 1321; Plaquemines Parish Com'n Council v. Delta Development, 502 So.2d 1034, 1055 (La.1987).
There are four categories or applications of contra non valentem that act to suspend liberative prescription: (1) when there is a legal cause that prevented courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) when there is a condition coupled with the contract or connected with the proceeding that prevent the creditor from suing or acting; (3) when the debtor himself did some act that effectually prevented the creditor from availing himself of his cause of action; and (4) when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Corsey, 375 So.2d at 1321-22. We have held that the third application of contra non valentem encompasses what is known at common law as the "continuous representation rule." Lima v. Schmidt, 595 So.2d 624, 630 (La.1992).
The continuous representation rule evolved at common law from Siegel v. Kranis, 29 A.D.2d 477, 288 N.Y.S.2d 831 (N.Y.1968). In Siegel, the court expressed concern about the disruptive effect that beginning the prescriptive period from the day of the alleged act or omission would have on the attorney-client relationship and applied the continuous treatment doctrine, that had been applied in medical malpractice cases to suspend prescription, to a legal malpractice claim. Siegel, 29 A.D.2d at 480, 288 N.Y.S.2d 831. Today, the continuous representation rule's rationale has several variations and has seemingly evolved to have a more expansive suspension effect. The continuous representation rule "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which services are rendered." Cantu v. St. Paul Cos., 401 Mass. 53, 514 N.E.2d 666, 669 (1987). It may also be said that the continuous representation rule protects the integrity of the attorney-client relationship and affords an attorney an opportunity to remedy an error while, at the same time, prevents the attorney from defeating the client's claim through pleading statute of limitations. Wall v. Lewis, 393 N.W.2d 758, 763 (N.D.1986). At common law, the continuous representation rule acts to suspend prescription or statute of limitations when: (1) there is an ongoing representation by the attorney; (2) on the same subject matter; (3) that is "continuous." See RONALD E. MALLON & JEFFREY M. SMITH, LEGAL MALPRACTICE vol. 3 § 22.13 Continuous Representation Rule, p. 431 (5th ed. 2000).
We first recognized the continuous representation rule in Braud, 576 So.2d at 468 (Prescription is suspended "during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred." ). We discussed the continuous representation rule the following year in Lima, 595 So.2d at 630. Before Braud and Lima, contra non valentem was applied to suspend prescription in cases of attorney malpractice. See Edward J. Milligan, Jr., Ltd. v. LaCaze, 509 So.2d 726 (La.App. 3d Cir.), writ denied, 512 So.2d 440 (La.1987); Olivier v. National Union Fire Ins. Co., 499 So.2d 1330 (La.App. 3d Cir.1986); Blanchard v. Reeves, 469 So.2d 1165 (La.App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985). In Blanchard, Blanchard's suit was dismissed by the trial court on grounds the suit had prescribed, but the appellate court reversed. Blanchard, 469 So.2d at 1167. Blanchard's attorney continued to represent *291 him and encouraged appeals. Id. The court characterized the attorney-client relationship:
In the instant case, had the attorney-client relationship ended after trial, we would apply the rule that prescription began to run from the date of the adverse trial judgment, when the plaintiff learned that the suit had been filed late. However, the issue is complicated by the fact that the attorney continued to represent Blanchard and pursue the case through the appellate process. There is no evidence to suggest that Reeves admitted to having been in error or that he was liable or in any way implied that an appeal was not worthwhile. On the other hand, there is none to suggest that the attorney deliberately and in bad faith continued to appeal in order to let prescription run on the plaintiff's cause of action against himself. What is clear is that the attorney-client relationship continued through denial of writs by the Supreme Court.
Id. (citations omitted). The court continued and held that:
The continuance of the attorney-client relationship poses a dilemma which reaches a crisis at time of judgment. The judgment then demonstrates that there is a conflict of interest between attorney and client as to cause of dismissal of the client's claim. At the same time it is beneficial to both if the matter is successfully appealed. As an attorney, Reeves was obligated to inform his client of the conflict of interest. The record does not disclose that he did. Had he done so, the client could have made a knowing choice as to whether to continue the relationship or seek other legal counsel. On the other hand, if Reeves was not aware of the conflict of interest, he would have us impose upon his client a greater burden of legal knowledge than he possessed. His continued representation without disclosure requires us to impose the principle of contra non valentum [sic]. We find that the attorney's conduct induced the plaintiff-client to delay filing the legal malpractice suit and prescription did not begin to run until denial of writs and cessation of the attorney-client relationship. Thus, suit filed against the attorney on March 14, 1984 was timely.
Id. at 1168 (footnotes omitted).
The third application of contra non valentem has been applied when the defendant had a fiduciary relationship with the plaintiff. See Delta Development, 502 So.2d at 1057. In Delta Development, we held that the pertinent question in applying the third application of contra non valentem was not whether the plaintiff had knowledge of his claim, but "whether the debtor himself had done some act or acts to prevent the creditor from availing himself of his cause of action." Id. If the debtor had done such an act, and where equity, justice, and fairness demanded it, the doctrine of contra non valentem should be applied to suspend prescription. Id. In describing how the fiduciary relationship between an attorney affects the application of contra non valentem to a case, we noted:
In fiduciary relationships, principals imbue their agents with a high degree of trust and confidence. The trust placed in the agent gives that agent opportunity to take unfair advantage of his principal. A fiduciary is expected, indeed he is bound, not to breach that trust. Thus, facts which appear suspicious to an ordinary business transaction may not incite suspicion when a relationship of trust exists. If suspicions are aroused, and the fiduciary quiets suspicions through misrepresentation of facts, deception, or affirmative concealment, *292 the principal is entitled to rely upon the fiduciary. Where no relationship of trusts exists, on the other hand, a person may not rely on the silence of his adversary.
Id. at 1059. We also noted the First Circuit's decision of Jackson v. Zito, 314 So.2d 401 (La.App. 1st Cir.), writ denied, 320 So.2d 551, 553 (La.1975), rev'd in part on other grounds, Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995, 999 (La.App. 1st Cir.1983), in which the appellate court held "an attorney who remains silent when prescription has run against his client would, in light of his fiduciary duty to said client, be guilty of an act which effectually prevented the client from availing himself of his action against said attorney." Jackson, 314 So.2d at 406-07.
Under Civil Code article 3492, Hendrick had one year from the day he sustained his alleged injuries to file suit against Stone Pigman. The lower courts did not determine when Hendrick suffered his alleged injuries. With regard to Stone Pigman's alleged malpractice, the failure to file a Rule 60(b) motion, the exact date Hendrick suffered his alleged injuries is difficult to determine because the time frame in which a Rule 60(b) motion can be filed varies depending on when it was reasonable to file a Rule 60(b) motion. See supra note 4 (discussing Rule 60(b)). Notwithstanding, at the latest, prescription began to run when Hendrick gained actual knowledge of his alleged malpractice claim against Stone Pigman in December 1988. Thus, Hendrick had until December 1989 to file suit. Hendrick filed suit on January 10, 1991. Hendrick's suit is timely only if prescription was suspended after December 1988. We find that under the circumstances presented in this case, the continuous representation rule as encompassed by the third application of contra non valentem should not be applied to suspend prescription. Therefore, we hold Hendrick's suit was not filed timely for the reasons that follow.
The continuous representation rule as encompassed by the doctrine contra non valentem, as an equitable doctrine, is not automatically applicable to all situations in which a client is represented by an attorney who is negligent during the course of the representation. Rather, the equitable nature of the circumstances in each individual case determines the applicability of the doctrine. See, e.g., Nathan v. Carter, 372 So.2d 560, 563 (La.1979); Dagenhart v. Robertson Truck Lines, Inc., 230 So.2d 916 (La.App. 1st Cir.1970). In deciding whether to apply the continuous representation rule as encompassed by contra non valentem, we find Cantu, 514 N.E.2d at 669, Economy Housing Co., Inc., v. Rosenberg, 239 Neb. 267, 475 N.W.2d 899, 900 (1991), and Outman v. United States, 890 F.2d 1050, 1053 (9th Cir.1989) persuasive for the proposition that the continuous representation rule is not always automatically or mechanically applied to suspend prescription or statute of limitations when there is a continuous attorney-client relationship.
We find the factual circumstances underlying Hendrick's suit are different from cases where prescription is suspended. In Hendrick's case, if a Rule 60(b) motion did indeed need to be filed, neither Stone Pigman nor Hendrick knew until the defendants in the RICO suit brought it to light. When the federal district court dismissed Hendrick's RICO claim, Stone Pigman told Hendrick of the judgment. Stone Pigman encouraged Hendrick to appeal. Stone Pigman did not inform Hendrick of a potential malpractice claim against Stone Pigman because Stone Pigman did not believe they had erred and Stone Pigman continues to argue vigorously that there was no malpractice. Assuming arguendo that Stone *293 Pigman was negligent, the failure of Stone Pigman to realize, as Steffes did, that there was a potential malpractice claim after the RICO suit was dismissed, and Stone Pigman's suggestion that Hendrick appeal, are both factors that may weigh in favor of applying contra non valentem. But, Stone Pigman's alleged failures must be examined in light of Hendrick's actual knowledge that he had a potential malpractice claim against Stone Pigman.
Hendrick did not innocently rely on Stone Pigman's advice. Rather, Hendrick sought advice regarding the RICO dismissal from Steffes, the attorney with whom Hendrick had an ongoing attorney-client relationship, albeit on another matter, and with whom Hendrick had worked with for two years in his Chapter 11 bankruptcy. The record does not reflect that Hendrick hired Steffes to examine Stone Pigman's work on the RICO suit, but Steffes did inform Hendrick that he had a malpractice claim against Stone Pigman based on information Hendrick conveyed to Steffes.
Hendrick not only had the federal district court opinion that dismissed his suit, but he had been told by his trusted attorney that he had a legal malpractice claim against Stone Pigman. Hendrick had actual knowledge that he had a potential malpractice claim against Stone Pigman. Although simply having knowledge of facts that may sustain a cause of action does not in and of itself defeat the third application of contra non valentem, see Delta Development, 502 So.2d at 1057, in this case, the principles that support the application of contra non valentem and, in particular, the continuous representation rule are absent. Hendrick knew more than just the facts that sustained a possible malpractice action, Hendrick was told by Steffes, an attorney with whom he had a continuing relationship, that he had a malpractice claim against Stone Pigman. Hendrick was a sophisticated businessman who had managed a large car dealership, who had a doctorate, and who once taught college courses. It is apparent from Hendrick's actions in seeking, in effect, "second opinions" regarding the federal court's dismissal of the RICO suit that he did not innocently rely on the attorney-client relationship he had with Stone Pigman. Hendrick's actions reflect that he did not repose his trust in Stone Pigman. Rather, Hendrick actively questioned and assessed Stone Pigman's performance.
The attorney-client relationship is built on trust and the continuous representation rule as encompassed by contra non valentem seeks to protect clients who rely on that trust and fail to file legal malpractice suits against their attorneys within the appropriate prescriptive period. Contra non valentem does not suspend prescription when a litigant is perfectly able to bring his claim, but fails to do so. When a client does not innocently trust and rely upon his attorney, but rather actively questions his attorney's performance, the client may be denied the safe harbor of contra non valentem if equity and justice do not demand its application. We find that the principles of equity, justice, and fairness that underpin the doctrine of contra non valentem are absent in this case; therefore, we decline to mechanically apply the continuous representation rule as encompassed by contra non valentem in a vacuum to suspend prescription in this particular case.

DECREE
For the foregoing reasons, the judgments of the court of appeal and trial court are reversed and set aside. Judgment is hereby rendered in favor of defendants and against plaintiff. Accordingly, the *294 malpractice action against Stone Pigman is dismissed with prejudice.
REVERSED.
VICTORY, J., concurs in the result.
JOHNSON, J., dissents.
LEMMON, J., concurs.
NOTES
[1] LA.REV.STAT. ANN. § 9:5605 was enacted in 1990 and amended in 1992 to provide a peremptive period for legal malpractice claims. LA. REV.STAT. ANN. § 9:5605 presently provides:

A. No action for damages against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section are remedial and apply to all causes of action without regard to the date when the alleged act, omission, or neglect occurred. However, with respect to any alleged act, omission, or neglect occurring prior to September 7, 1990, actions must, in all events, be filed in a court of competent jurisdiction and proper venue on or before September 7, 1993, without regard to the date of discovery of the alleged act, omission, or neglect. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.
C. Notwithstanding any other law to the contrary, in all actions brought in this state against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional law corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, the prescriptive and peremptive period shall be governed exclusively by this Section.
D. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
E. The peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.
[2] The proposed purchase of Hendrick's Stingray stock came about after H.E. Avent, Sr. and Brantley Burnett indicated that they wanted to acquire a controlling interest in Stingray.
[3] There were various interests involved in the sale of the stock. The creditors of the bankruptcy estate had an interest in being paid from the proceeds of the sale and the bankruptcy estate had an interest in being released from the uncertainty and possible four million dollar liability, as listed on the bankruptcy schedule, in the Collins suit. Additionally, Judith Polk, a creditor of the estate, desired the prompt liquidation of assets and demanded that Starns sell the Stingray stock; she had a pressing interest in resolving the community property issues and obtaining her property.
[4] "Rule 60(b) enables a court to grant a party relief from a judgment in circumstances in which the need for truth outweighs the value of finality in litigation. Rule 60(b) is not a substitute for a proper Fed.R.Civ.P. 60 and timely appeal, however." 12 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 60.02[2] ¶ 1 (3d ed. 2000).

Rule 60(b) provides:
(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.
FED.R.CIV.P. 60(b).
One of the central issues in Hendrick's malpractice claim is the time frame in which a Rule 60(b) motion needed to be filed, if it needed to be filed. Rule 60(b) requires that a motion under Rule 60(b)(1), (2) & (3) must be made within a reasonable time "not more than one year after the judgment, order, or proceeding was entered or taken." Id. Stone Pigman contends that the Rule 60(b)(3) motion needed to be filed less than a year from the February 13, 1985 order, if the motion did indeed need to be filed, because Hendrick, Rubin, Starns and Steffes all knew that they had not received the whole story regarding the sale of the Stingray stock at the hearing. Thus, Stone Pigman argues that if there was any malpractice, it occurred before they were appointed special counsel in April 1985 and was not attributable to them. Hendrick, on the other hand, argues that Stone Pigman had ample time to file a Rule 60(b)(3) motion and that Stone Pigman's failure to do so caused him damages.
[5] Hendrick filed suit after LA.REV.STAT. ANN. § 9:5605 was enacted in 1990 and before LA.REV.STAT. ANN. § 9:5605 was amended to provide the grace period and to provide the statute was retroactive.
[6] The appellate court did not reach the constitutionality of LA.REV.STAT. ANN. § 9:5605 because it was unnecessary to the resolution of the case. Because we find that Hendrick's claim is prescribed under the law predating the enactment of LA.REV.STAT. ANN. § 9:5605, we pretermit a discussion of the constitutionality of LA.REV.STAT. ANN. § 9:5605.