50 So.3d 173 (2010)
August GUILLOT and Juli Guillot, individually and as The Survivors of their Minor Child, Collin Jacob Guillot, and Natural Tutor of Their Minor Child, Madison Guillot
v.
DAIMLERCHRYSLER CORPORATION, Lamarque Dodge, Inc., ABC Insurance Company, XYZ Insurance Company and John Doe.
No. 2008-CA-1485.
Court of Appeal of Louisiana, Fourth Circuit.
September 24, 2010.
*177 Dawn M. Barrios, Bruce S. Kingsdorf, Barrios, Kingsdorf & Casteix, L.L.P., J. Van Robichaux, Jr., Robichaux Law Firm, New Orleans, LA, Scott P. Nealey, Lieff Cabraser Heimann & Bernstein, L.L.P., *178 San Francisco, CA, for Plaintiffs/Appellees.
C.G. Norwood, Jr., Gary G. Hebert, McGlinchey Stafford, PLLC, New Orleans, LA, for Chrysler LLC.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge MAX N. TOBIAS, JR., Judge ROLAND L. BELSOME).
ROLAND L. BELSOME, Judge.

FACTS AND PROCEDURAL HISTORY[1]
On May 21, 1999, August and Juli Guillot and their three-year-old daughter, Madison, entered Juli's 1999 Jeep Grand Cherokee in preparation to drive from their home in Violet, Louisiana to the North Shore Regional Medical Center in Slidell. Juli was nine months pregnant with a boy, who August and Juli had named Collin. After the three of them were seated in the vehicle, August shifted the vehicle into reverse, and Madison, who was in the back seat, asked for a songbook. To accommodate Madison's request, Juli exited the vehicle, closed the front passenger door, and opened the rear passenger door to reach for Madison's book. Remembering that some phone calls might need to be made, Juli asked August to retrieve their cell phone. August exited the vehicle[2] and proceeded towards the rear of the Jeep.
As Juli was bending over to retrieve the songbook, she looked up through the passenger window and noticed that August had passed the driver's side rear door. Juli then felt the door of the Jeep pressing against her arm and midsection. Juli screamed for August as she became pinned between the door of the Jeep and a brick column supporting the carport. Realizing that Juli was in severe distress, and noticing that the Jeep was moving backwards, August re-entered the vehicle, stepped on the brake, and pulled forward. Juli collapsed and began to experience severe pain, nausea, and weakness, and could feel Collin kicking inside of her. Juli was suffering from massive internal bleeding.
As a result of Juli's midsection being crushed between the door of the Jeep and the column, Collin had perforated the top of Juli's uterus and was pushed into her abdominal cavity. Juli required surgery to remove Collin from her abdomen, and also to cut her pericardial sac to determine whether her heart had been damaged by Collin's displacement, as a contusion in that area was detected. Juli was hospitalized for five days following the accident, and Collin had to be placed on life support. Collin was permanently brain damaged due to lack of oxygen. After seventeen days, August and Juli made the difficult decision, along with their physician, Dr. Jane Reynolds, to remove Collin from life support on June 7, 1999.[3]
On June 9, 1999, local counsel for Chrysler LLC faxed a copy of the Guillots' accident report to Chrysler headquarters.
On July 13, 2001, Juli received a telephone call from a Los Angeles Times reporter who had investigated complaints on Jeep Grand Cherokees and noticed an article regarding her May 21, 1999 accident from the Associated Press. The reporter described his Times article detailing the *179 investigations, and sent Juli a copy of his article via electronic mail that same day. After the discussion with the reporter, the Guillots consulted with an attorney for the first time, and filed their petition on November 30, 2001. The matter went to trial on March 31, 2008.
On April 10, 2008, the trial court rendered judgment on the jury's April 8, 2008 verdict, awarding total damages to Appellees in the amount of $5,080,000.00, allocating 99% of the fault to Chrysler, LLC and 1% to August Guillot. Juli Guillot was awarded, before the 1% reduction, $2,775,000.00; August Guillot was awarded $2,100,000.00; and to August and Juli Guillot as tutors of their minor child, Madison Guillot, $125,000.00. The court also awarded special damages and a survival action for Collin in the amount of $80,000.00.[4] This appeal followed.[5]

APPELLANT'S ASSIGNMENTS OF ERROR[6]
1.) The trial court erred as a matter of law in not finding that the action had prescribed, as it was filed two and a half years after the date of the accident.
2.) The trial court erred as a matter of law by refusing to consider evidence that would demonstrate plaintiff's expert's opinion should have been excluded, and by refusing to rule before trial on the Daubert/Foret objection.
3.) The trial court abused its discretion in admitting expert opinion testimony and other evidence that allowed the jury to find a defective product and causation.
4.) The trial court erred in admitting inflammatory and irrelevant evidence regarding the fact that the manufacturer's attorneys had a copy of the police report of the accident shortly after it occurred.
5.) The verdict is clearly wrong in allocating only 1% of fault to August Guillot.

*180 6.) The trial court erred in permitting the jury to award elements of general damages that are duplicative and not supported by legal authority.
7.) The jury abused its discretion in awarding excessive general damages.

DISCUSSION

Assignment of Error # 1
In the first assignment of error, Chrysler asserts that the trial court erred in failing to find that the Guillots' claim had prescribed. It is undisputed that the petition is prescribed on its face,[7] as the accident occurred on May 21, 1999, and suit was filed on November 30, 2001; therefore, the burden shifted to Appellees to demonstrate the suspension, interruption, or renunciation of prescription. See London Towne Condominium Homeowner's Ass'n v. London Towne Co., 2006-401, pp. 9-10 (La.10/17/06), 939 So.2d 1227, 1234.
This Court has recognized that "[prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong." Hoerner v. Wesley-Jensen, Inc., 95-0553, pp. 3-4 (La.App. 4 Cir. 11/20/96), 684 So.2d 508, 510 (quoting Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987)). Rather, prescription begins to run against a claimant when he obtains actual or constructive knowledge of facts indicating a cause of action. Campo v. Correa, 2001-2707, pp. 11-12 (La.6/21/02), 828 So.2d 502, 510. Constructive knowledge of facts "is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." Campo, 2001-2007, p. 12, 828 So.2d at 510-11. Constructive knowledge is also "tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and is sufficient to commence the running of prescription. Id., p. 12, 828 So.2d at 511. Mere apprehension that something could be wrong, however, is not considered constructive knowledge sufficient to begin the running of prescription. In re Medical Review Panel of Howard, 573 So.2d 472, 474 (La.1991); Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574, 577 (La. 1980).
The doctrine of contra non valentem agere nulla currit praescriptio, an exception to the rule that prescription runs against all persons unless provided by legislation,[8] arose from a "long-established principle of law that one should not be able to take advantage of his own wrongful act."[9]Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206, 212; Nathan v. Carter, 372 So.2d 560, 562 (La.1979). Pursuant to the doctrine of contra non valentem, prescription does not run against a claimant who is ignorant of the existence of facts that would entitle him to a cause of action, provided that his ignorance is not willful, negligent or unreasonable.[10]White *181 v. West Carroll Hospital, Inc., 613 So.2d 150, 155-56 (La.1992); Corsey v. State, Through Department of Corrections, 375 So.2d 1319, 1321 (La.1979). There are four categories[11] of contra non valentem that suspend liberative prescription. The instant case involves the fourth category, known as the discovery rule, when the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant. Hendrick v. ABC Ins. Co., 2000-2403, 2000-2349, p. 10 (La.5/15/01), 787 So.2d 283, 290. The Louisiana Supreme Court has held that "[t]he equitable nature of the circumstances in each individual case has determined the applicability of the doctrine." Nathan, 372 So.2d at 563.[12]
Chrysler argues that the doctrine of contra non valentem is inapplicable to suspend prescription in this case because the Guillots were aware on the date of the accident the facts upon which their cause of action was based. Specifically, Chrysler argues that the Guillots' delay in filing suit was not reasonable, because although the Guillots may not have immediately known the cause of the delayed movement, the Guillots knew on the date of the accident that their Jeep moved in reverse after a delay.
We find that the Guillots' claim is similar to the claims alleged by the plaintiff in Hoerner v. Wesley-Jensen, Inc., 95-0553, 684 So.2d 508. In Hoerner, the plaintiff developed ulcerative keratitis, a severe eye infection, necessitating a corneal transplant, as a result of allegedly defective extended-wear contact lenses. Ms. Hoerner purchased the extended-wear lenses in November 1986, developed the infection in May 1987, and received the corneal transplant in July 1987. In November 1989, Ms. Hoerner reviewed a magazine article regarding the connection between the use of extended-wear lenses and the significantly increased risk of eye infections. This Court found that at the time Ms. Hoerner read the article, she first became aware that her 1987 infection resulted from the use of the extended-wear contacts.
Neither of Ms. Hoerner's physicians suggested a connection between her extended-wear lenses and her infection, and Ms. Hoerner simply assumed "she was the unfortunate recipient of a ubiquitous germ like one who contracts measles or a cold." The Defendants argued that the causal relationship between contact lenses and ulcerative keratitis was widely evident prior *182 to 1987, and that common knowledge should have been construed as constructive knowledge on the part of Ms. Hoerner. This Court rejected those arguments, holding that "the knowledge that contact lens use in general could cause infection is not sufficient to put Ms. Hoerner on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses as they were designed and marketed by the defendants to be worn." Id., 684 So.2d at 511. Additionally, not until 1989 were the hazards of extended-wear lenses recognized in the medical community.[13] Therefore, this Court found that because the documentary evidence was not published until 1989, negated the defendant's expert's "vague assertions that the risks of extended-wear lenses were `always common knowledge' to eye care professionals." Id. Consequently, Ms. Hoerner could not have discovered the defendants' wrongful conduct by questioning her physicians as to the cause of her infection in 1987. Id.
Although Ms. Hoerner knew she had suffered an injury in July 1987, "her reasonable inquiry as to the cause of her infection and injury resulted in her being told only that the harm had been caused by a particular bacteria present throughout the environment." Id. at 514. Accordingly, because "a prescriptive period does not begin to run until a claimant has knowledge of the damage, the wrongful act and the connection between them," this Court concluded that the record did not evidence that Ms. Hoerner knew or should have known more than one year before she filed suit that her injury may have been related to the defendants' conduct, and reversed the trial court's grant of the defendants' exception of prescription. Id. (emphasis in original).
Like the plaintiff in the Hoerner case, the Guillots had no reason to suspect anything other than an unfortunate mistake on the part of Mr. Guillot. When questioned why he assumed he left the vehicle in reverse rather than immediately suspecting a defect, Mr. Guillot testified, "It's the only thing I could think that happened."[14] Furthermore, no person who investigated the accident suggested or suspected a vehicle defect.[15] The record evidences *183 that the Guillots were not put on notice sufficient to excite attention and put them on guard and call for inquiry, nor did the Guillots possess constructive knowledge "tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." Campo, 2001-2007, p. 12, 828 So.2d at 510-11. Furthermore, an appellate court shall not disturb the trial court's findings with regard to an exception of prescription absent manifest error. Marino v. Tenet Healthsystem Medical Center, 2009-0915, pp. 3-4 (La.App. 4 Cir. 11/24/99), 26 So.3d 297, 299.
Additionally, we find Appellant's reliance upon Eastin v. Entergy Corporation, 2003-1030 (La.2/6/04), 865 So.2d 49 is misplaced. Eastin involved an age discrimination claim by hundreds of employees against their former employer. Eastin, pp. 1-2 (La.2/6/04), 865 So.2d 49, 51-52. The plaintiffs sought class certification, and filed several supplemental and amending petitions. Eastin, p. 2, 865 So.2d at 52. The Defendants filed exceptions of prescription as to eleven plaintiffs ("Eleven Plaintiffs"), arguing that the eighth supplemental and amending petition contained no allegation as to when the Eleven Plaintiffs knew or should have known of their claim, and the trial court granted the exception. Id. at p. 3, 865 So.2d at 53. The Eleven Plaintiffs appealed and the appeals court reversed, finding that the doctrine of contra non valentem was applicable. Id. The Louisiana Supreme Court reversed, finding that "it is well settled that the damage is sustained in any employment discrimination case at the earlier of the date the employee is informed of his termination or his actual separation from employment." Id. at p. 3, 865 So.2d at 53.
The Court rejected the Eleven Plaintiffs' argument that they could not know of the discrimination until they knew of the alleged pattern of discrimination whereby others were also terminated for age-related reasons, and learning of others' lawsuits. Eastin, p. 7, 865 So.2d at 55. The Court noted that the appropriate standard "does not revolve around the knowledge of others who have filed suit, but relates to the plaintiff's reasonableness." Id. at p. 8, 865 So.2d at 56. The Court distinguished the Eleven Plaintiffs' employment discrimination claims from medical malpractice actions, in which plaintiffs may be prevented from knowing of their damages because the damages are manifested at a later date. Id. The Court concluded that the Eleven Plaintiffs' delay in filing suit was not reasonable, as actual knowledge of the termination gave rise to their cause of action and began the running of prescription. Id.
The facts of the instant case are plainly distinguishable from Eastin.[16] As the *184 Louisiana Supreme Court noted, the standard for employment actions to begin the running of prescription is the adverse employment action itself. Employees who allege wrongful termination are ostensibly aware of the termination at the time it occurs. The Guillots' delay in filing suit is simply not analogous to a delay in making a claim for a wrongful termination, because the Guillots did not have the appropriate information to file a claim at the moment the accident occurred. Furthermore, the Guillots' behavior after the accident was reasonable. As previously noted herein, although the accident was investigated, a vehicle defect was never suspected by the investigating officer, and Mr. Guillot blamed himself for the accident for two years. "Contra non valentem acts to suspend prescription where the action or inaction of the plaintiff is reasonable", and we find that the Guillots acted reasonably in initially assuming the vehicle had been left in reverse, accepting the investigating officer's findings, and not immediately consulting an attorney to file suit against Chrysler. Eastin, p. 8, 865 So.2d at 56.
We are likewise unpersuaded by Chrysler's argument that Allstate Ins. Co. v. Fred's Inc., 2009-2275 (La.1/29/10), 25 So.3d 821, renders contra non valentem inapplicable to the facts of the instant case. In Allstate, the Louisiana Supreme Court noted that "Allstate's two-year delay between its discovery request and its motion to compel, plus an additional year before adding Colony [Insurance Company, the insurer of L & L Import, the manufacturer of an allegedly defective lamp] to the suit, evidences a lack of due diligence on the part of Allstate, precluding application of the contra non valentem doctrine." Id. Thus, the Court simply concluded that Allstate displayed a lack of due diligence in failing to determine L & L Import and Colony's identity until two years after propounding discovery, and another year after that before adding Colony to the lawsuit. The facts of Allstate are plainly inapposite to the facts of this case. This assignment of error lacks merit.

Assignments of Error # 2 and # 3
In the second and third assignments of error, Chrysler argues that the trial court improperly declined to exclude Gerald Rosenbluth's expert opinion and did not consider Daubert/Foret evidence in connection with Mr. Rosenbluth's testimony. Chrysler further objects to the trial court's admission of Mr. Rosenbluth's demonstrations regarding the gear shift; the trial court's admission of reports of other accidents involving Jeep Cherokees; and the trial court's admission of James Williams' opinions regarding the corporate conduct of Chrysler and its counsel subsequent to the Guillots' accident.
In Lam v. State Farm, this Court held that a trial court's failure to hold a Daubert[17] hearing regarding the qualification of a defendant's expert was legal error. Lam v. State Farm Mut. Auto. Ins. Co., 2003-0180 (La.App. 4 Cir. 4/1/05), 901 So.2d 559, aff'd in part, rev'd in part on other grounds, 05-1139 (La.11/29/06), 946 So.2d 133. In this case, however, the record *185 evidences, and Chrysler acknowledges in its brief, the trial court conducted a Daubert hearing at trial.[18]
Additionally, this Court has held that "[a] trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous." Laura's Products, Inc. v. 600 Conti Street, LLC, 2007-0819, p. 10 (La.App. 4 Cir. 4/9/08), 982 So.2d 934, 940 (citing Radlein v. Holiday Inns, Inc., 07-0322, p. 7 (La.App. 4 Cir. 11/14/07), 971 So.2d 1200, 1205); see also Lam, 2003-0180, p. 5, 901 So.2d at 565 (recognizing that "absent clear error, the trial court's decision regarding the testimony of an expert will not be reversed on appeal"). Mr. Rosenbluth testified that he has been qualified as an expert regarding his methodology hundreds of times in state and federal court in the past thirty years, and that he had been an expert with regard to the particular transmission systems at issue in the instant case on over 120 occasions. Although not an engineer himself, Mr. Rosenbluth also testified that his methodology was analogous to that used by engineers at the NHTSA, the federal government's Vehicle Research Testing Center, and also General Motors, Ford, and Chrysler. Moreover, Chrysler was afforded the opportunity to cross-examine Mr. Rosenbluth. Accordingly, we find no manifest error in the trial court's admission of Mr. Rosenbluth's expert opinion after conducting the requested Daubert hearing.
Next, Chrysler argues that Mr. Rosenbluth's methodology was improper because he intentionally manipulated the gearshift from park to reverse in order to achieve the desired result.[19] Likewise, Chrysler argues that the trial court erred in allowing Appellees' expert James Williams to corroborate Mr. Rosenbluth's findings, as Mr. Williams also intentionally manipulated the gearshift. Chrysler further argues that the video of Mr. Rosenbluth's tests, which the jury viewed, was unfairly prejudicial under La.Code Evid. art. 403[20] because his repeated manipulations to achieve the gearshift's misposition were intentional, while Appellees' theory was that Mr. Guillot inadvertently mispositioned the gearshift.[21]
It is well-settled that a trial court is allowed great discretion in assessing the probative value of evidence pursuant to La.Code Evid. Art. 403. Gurley v. Encompass Ins. Co. of America, 2007-1477, p. 3 (La.App. 4 Cir. 5/14/08), 985 So.2d 299, 302. "Upon review, the trial court's rulings on issues such as the relevance of evidence and whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect should not be disturbed absent a clear abuse of discretion." Id. at pp. 3-4, 985 So.2d at 302 (citing Jones v. Peyton Place, Inc., 95-0574, pp. 11-12 (La.App. 4 Cir. *186 5/22/96), 675 So.2d 754, 763).[22] Furthermore, it was established at trial that the precise place where such a mispositioning of the gearshift can occur is extremely small, and the likelihood of achieving a misposition is likewise small. Mr. Rosenbluth testified that he located this small area and performed his testing accordingly, rather than attempting natural shifts to achieve the result inadvertently.[23] Considering the foregoing, we do not find that the record evidences an abuse of discretion by the trial court in allowing the jury to view the video of Mr. Rosenbluth's testing or in admitting Mr. Williams'[24] expert testimony.[25]
With regard to evidence regarding other similar incidents ("OSIs"), Chrysler argues that the trial court erred in allowing Mr. Williams to present evidence of numerous customer complaints to Chrysler regarding incidents involving Jeep Cherokees. Chrysler argues that the trial court erred in allowing Mr. Williams' testimony regarding these OSIs without questioning him as to the substantial similarity *187 of the incidents compared to the Guillots' experience, because the OSIs were not substantially similar with respect to the vehicle, the specific defect, and the facts of the OSI. Specifically, Chrysler argues that the Guillots' Jeep, a WJ model 1999 Grand Cherokee, was different from earlier models in the OSI summary in that it had a different gear shift selector.
It is well-settled that "a trial judge is accorded discretion under [La.Code Evid. arts. 401-403] concerning the admission of evidence on the grounds of relevance, and the trial court's decision will not be reversed absent a finding of abuse of discretion." Brodtmann v. Duke, 96-0257, p. 12 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 455 (citing Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 312); see also Gurley, 2007-1477, pp. 3-4, 985 So.2d at 302. While we agree with Chrysler's contention that properly submitted "other accident" evidence must be substantially similar to the accident at issue,[26] we find that such evidence was substantially similar in the instant case.
In this case, the record evidences, and the trial court found, that Mr. Rosenbluth laid a foundation which established a substantial similarity between the OSIs and the Guillots' accident, because in each instance, the transmission was identical to the transmission that was in the Guillots' Jeep Grand Cherokee. Mr. Rosenbluth testified regarding his inspection of the Guillots' vehicle as well as several park-to-reverse accidents where he inspected the vehicle and the accident scene.[27] In one such accident that Mr. Rosenbluth investigated, the jury viewed a video, captured by bank surveillance cameras, of an accident in which the driver and sole occupant of a 1998 Jeep Cherokee exits the vehicle and approaches an ATM machine; the Jeep moves on its own approximately eighteen seconds later. Mr. Rosenbluth testified regarding his two inspections of the Jeep involved in this accident, as well as his inspection of the site where the accident occurred, and testified that the unintended powered reverse occurrence was similar to the 1999 Jeep Grand Cherokee.
The trial court also admitted a February 2003 report from the National Highway Traffic Safety Administration's ("NHTSA") Vehicle Research Testing Center ("VRTC") in East Liberty, Ohio, in which Jeep Grand Cherokees ranging from 1993 to 1999 were tested regarding the unintended powered reverse problem.[28] *188 In the report, no substantial differences between the 1999 Jeep Grand Cherokee and the 1993-1998 Jeep Grand Cherokees were noted. Mr. Rosenbluth testified regarding the lack of distinction between the 1999 Jeep Grand Cherokee and other Jeep Grand Cherokees in the VRTC report:
Q. Mr. Rosenbluth, I just have a very specific question. They did a report, the Vehicle Research Testing Facility said they did a report in which they tested 1999 Grand Cherokee?
A. Correct.
Q. And what did the Vehicle Research Testing Center find when they tested [the] 1999 Grand Cherokees with the in line six [the type of vehicle involved in the Guillots' accident] and the 42RE transmission. When they tested them, what were the results of their test? What did they show?
A. They found they didn't behave significantly different from the '93 to '98.
Q. And did the Vehicle Research Testing Center, did they find that you could take a Grand Cherokee with the in line six and 42RE transmission like this from 1999, and have a delayed engagement of hydraulic reverse on it?
A. Yes, they did.
Q. And in all the testing of 1999 Grand Cherokees with an in line six and 42RE transmission, just like the Guillots' vehicle, did they find that every one of those vehicles had a delayed engagement in reverse?
A. Yes.
Q. And did they find any substantial difference in the performance of the 1999 Grand Cherokees with the in line six and the 42RE transmission in the '93 to '98 vehicles?
A. Not any significant difference.
* * * *
Q. And Mr. Rosenbluth, in the various testing that was done, as described in the VRTC report which I've marked as Exhibit 90, did NHTSA utilize the same methodology and test procedures that you use in this case?
A. NHTSA did, and the [V]RTC did, as well.
Furthermore, although Chrysler argues that the new shift selector in 1999 Jeep Grand Cherokees distinguishes it from other vehicles such that the OSIs were improperly admitted, the record demonstrates that the NHTSA found that the 1999 shift selector did not eliminate the potential to have an unintended powered reverse on a Jeep Grand Cherokee. Chrysler's expert, Mr. Keefer, testified that he did not dispute the NHTSA's findings in this respect:
Q. And, sir, we've heard some discussion about the change from [counsel for Chrysler]. And in fact the 1993 to 1998 Grand Cherokees had an older shift selector, didn't they, sir. This one right here?
A. That looks like it.
Q. Okay. And in 1999, some people, if you got a V8 you got the new transmission, but everybody got this new shift selector, right?
A. They got the one over there, yes, if that's the same one.
Q. Now, what did NHTSA say about the addition of the shift selector. Did they say that made it impossible to have unintended powered reverse in this car, the same '99s that they tested?
A. My recollection is that they said that there were three or, I think it was four, significant improvements and that the complaint rates were different, down, way down, and that they could, in fact, if they worked at it, still get what they called the UPR, which is consistent with the kind of thing that we did with *189 the variety of vehicles having this positioning and reengagement.
Q. And discussing the 1999 Grand Cherokees, what NHTSA said was, "Unintended powered reverse was found to occur only when the transmission was not shifted into gated park and when hydraulic reverse temporarily disengaged during the shift process. A flat spot on the manual lever between reverse and park appears to be a major factor contributing to mis-shifting. The addition of a new shift lever detent and spring on the 1999 and later models" That's what we just saw, right, sir? That's the new shift lever from 1999?
A. Yes. That's the detent.
Q. "May reduce the probability but not eliminate the possibility of mis-shifting the transmission. The new components had no effect on the occurrence of early hydraulic disengagement." Is that what the NHTSA said?
A. Early hydraulic disengagement. I'm not sure what that means, but that's what they said. You read it properly and that's, generally, consistent with what I told you?
Q. Do you agree with what the NHTSA said?
A. I have no reason to disagree with their findings.
Considering the foregoing, we do not find that the trial court abused its discretion in admitting OSI demonstrations and testimony on the basis of substantial similarity. Likewise, we find that the probative value of such evidence outweighed any prejudicial effect. See Gurley, 2007-1477, pp. 3-4, 985 So.2d at 302.
Next, Chrysler argues that the trial court erred in admitting irrelevant and prejudicial evidence of alleged negligence and wrongdoing by Chrysler and its attorneys. Appellees' expert, James Williams, testified regarding other accidents that had been investigated by Chrysler, as well as Chrysler's corporate conduct with respect to Jeep Grand Cherokee customer complaints received by Chrysler. Mr. Williams testified that, up until the date of the Guillots' accident on May 21, 1999, Chrysler had received over 200 park-to-reverse customer complaints regarding the Jeep Grand Cherokee with the transmission that went into production in 1993. Of the 200 customer complaints that he reviewed, twenty-two were admitted into evidence. These twenty-two customer complaints were instances where Chrysler's investigators were able to successfully achieve the delayed engagement from placing the vehicle between park and reverse that had been alleged in the customer complaint. Additionally, each of the twenty-two vehicles involved in the customer complaints had the same transmission as the one in the Guillots' vehicle. As previously noted herein, we find no error on the part of the trial court in the admission of Mr. Williams' testimony with regard to the customer complaints or in admitting into evidence the twenty-two complaints in which the delayed engagement of reverse was achieved by Chrysler's investigators.[29]
Likewise, we disagree with Chrysler's contention that the trial court erred in *190 admitting denial letters Chrysler sent in response to customer complaints. The letters were relevant to Chrysler's theory that August was at fault in the accident. Accordingly, the trial court did not abuse its discretion with respect to the admission of the denial letters.[30]See Brodtmann v. Duke, 96-0257, pp. 12-13 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 455-456.

Assignment of Error # 4
In its fourth assignment of error, Chrysler argues that the trial court erred in admitting evidence establishing that Chrysler's New Orleans counsel faxed a copy of the Guillots' police report to Chrysler's Office of General Counsel on June 9, 1999. Chrysler submits that the document was introduced merely to inflame the jury, as counsel for Appellees noted that it was faxed on the same date that Collin was buried, and suggested that Chrysler's tracking of the Guillots' accident while the prescriptive period ran was evidence of Chrysler's awareness of a defect. Chrysler further argues that the incident report was inadmissible hearsay under La.Code Evid. Art. 803(8)(b)(i).[31] At trial, Chrysler objected to the admission of the report, but the trial court overruled the objection, noting that the fax was relevant to the issue of prescription, which Chrysler also asserts was an error by the trial court, as prescription was a legal issue for the court to decide.
As recognized previously herein, a trial court is afforded vast discretion with regard to evidentiary rulings, and the court's decision to admit or deny evidence will not be disturbed on appeal absent a clear abuse of that discretion. Jones v. Peyton Place, Inc., 95-0574, pp. 11-12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763. Where improperly admitted evidence is merely corroborative and cumulative of other properly introduced evidence, it is considered harmless error. State v. Taylor, 2001-1638, p. 22 (La.1/14/03), 838 So.2d 729, 748. We find that even if the police report were improperly admitted, the error, if any, was harmless. The trial court noted that the fax was relevant not only to the issue of prescription, but also as evidence of Chrysler's possession of information regarding the Guillots' accident at the time it occurred. Therefore, we do not find that the trial court's decision to admit the police report constituted a clear abuse of the trial court's vast discretion. See Jones, supra; see also Brodtmann v. Duke, 96-0257, p. 12, 708 So.2d at 456 (emphasizing the trial court's vast discretion with regard to the admission of evidence on the grounds of relevance).

Assignment of Error # 5
In its fifth assignment of error, Chrysler argues that the jury's verdict was *191 clearly wrong in allocating only 1% of fault to August Guillot, and that his percentage of fault should be increased, as the jury found that his negligence proximately caused or contributed to the damages. Chrysler submits that Mr. Guillot was aware of the danger, had the last clear chance to prevent the accident, and was careless in not ensuring that the vehicle was in park.
With regard to allocation of fault, great deference is afforded to trier of fact. Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610. "[A]llocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the fact finder within that range cannot be `clearly wrong.'" Foley v. Entergy La., Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award. Clement, 95-1119 at p. 7, 666 So.2d at 611. In determining allocation of fault, a jury is obligated to consider the nature of each party's wrongful conduct and the extent of the causal relationship between that conduct and the damages suffered. See Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 971 (La. 1985).[32]
Upon a careful review of the record, we find that the jury's findings as to the allocation of fault are reasonable and were not an abuse of discretion. We disagree with Chrysler's alarmist assertion that the allocation of only a nominal degree of fault to August Guillot will serve as a disincentive to other drivers to act prudently before exiting their vehicles.

Assignment of Error # 6
In the sixth assignment of error, Chrysler argues that the trial court erred in allowing the jury to award duplicative elements of general damages.
First, Chrysler argues that the trial court used a verdict form that over-itemized related items and thus allowed several elements of damages that were duplicative and not recoverable under Louisiana law. Chrysler submits that in addition to general damages, the jury also awarded August Guillot separate awards for his mental anguish and emotional distress, wrongful death, loss of consortium for Juli Guillot's injury, and his own lost enjoyment of life. Chrysler argues that each compensating emotional or mental injury to a plaintiff who was not physically injured is improper as a matter of law, and that at a minimum, the jury's $200,000.00 award for Mr. Guillot's lost enjoyment of life should be vacated.
With regard to Mr. Guillot's damages for loss of enjoyment of life, both Mr. Guillot and Lt. Lee[33] testified regarding the mental anguish and distress Mr. Guillot personally suffered as a result of the accident. Juli also testified regarding Mr. Guillot's tremendous emotional suffering resulting from the accident:
Augie was real depressed, and he was real sad and everything, and it was like, *192 I've got to keep my family together. This is horrible. We've got to make it through this. He looked at me; we were sitting at the table and he said, Juli, I know you blame me, and I said, I don't blame you. I said, if you blame yourself, then, maybe, we need to get you some help, but [I] said, I don't blame you for this. We just had to  we had to hold our family together. We had a three-year-old.
Accordingly, the jury could reasonably award damages for Mr. Guillot's loss of enjoyment of life as a result of his injuries,[34] as "a participant in an accident *193 is entitled to recover any damages sustained as a result of an injury, whether physical or mental or both." Brodtmann, 96-0257 at 24, 708 So.2d at 461 (citing Morris v. Maryland Cas. Co., 94-1556 (La.App. 3 Cir. 5/3/95), 657 So.2d 198)(holding that a train engineer was allowed recovery for "serious psychological damages" resulting from an accident with an automobile even though engineer sustained no physical damages). In Molden v. Georgia Gulf Corporation, the Court examined the Third Circuit's reasoning in Morris, supra, noting that "[w]hat was important to the court in Morris was the plaintiff's involvement in the accident which caused his serious psychological damage." Molden v. Georgia Gulf Corporation, 465 F.Supp.2d 606, n. 77 (M.D.La.11/14/06)(emphasis added). Accordingly, where a plaintiff is an "actual participant[ ] in an accident . . . mental anguish [is] clearly a foreseeable injury." Molden, 465 F.Supp.2d at 617.[35]
Furthermore, loss of enjoyment of life may be listed as a separate item of damages pursuant to La. Civ.Code art. 2315.6 and the Louisiana Supreme Court's decision in McGee v. AC & S, 2005-1036, p. 6 (La.7/10/06), 933 So.2d 770, 774-75. Noting that "[c]ourts commonly list different elements of general damages, including mental anguish and physical pain and suffering, both past and future, separately," the McGee Court held that "allowing a separate award for loss of enjoyment of life would not offend the existing concept of general damages and would reflect the accepted method of listing elements of general damages separately." Id. (emphasis added). The Court further described the distinction between the loss of enjoyment of life and other types of general damages:
Moreover, loss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.

Id. (emphasis added).
The Court also described the distinction between loss of enjoyment of life and loss of consortium, noting that "[l]oss of consortium is a harm to a relational interest which occurs when the other party to the relationship suffers physical harm (invasion of an interest or personality)."[36]Id. *194 at p. 13, 933 So.2d at 779. Likewise, this Court explicitly recognized the Louisiana Supreme Court's position that a separate award for loss of enjoyment of life is not erroneous as a matter of law, and thus may properly be listed as a separate and independent item of damages, in McGee v. AC & S, supra, in Clarkston v. Louisiana Farm Bureau Cas. Ins. Co.:
Notably, in McGee v. AC & S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770, the Supreme Court specifically rejected this court's earlier position that a separate award for loss of enjoyment is erroneous as a matter of law: "A majority of the lower courts have supported this position by allowing separate awards for loss of enjoyment of life . . . while only the Fourth Circuit Court of Appeal has held that such an award is erroneous as a matter of law . . . However, we reject the Fourth Circuit's conclusion . . ." Id., pp. 7, 12, 933 So.2d at 776, 778.
Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 2007-0158, p. 38 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, n. 15 (quoting McGee, supra).
While we are mindful of the McGee Court's language regarding awards to family members of the primary tort victim for loss of enjoyment of life, it is important to note that those principles are inapplicable to the particular facts of this case. The McGee Court commented that allowing a family member of a primary tort victim to recover for both loss of enjoyment of life and loss of consortium would be duplicative. McGee, p. 13, 933 So.2d at 779. To illustrate how the awards could be considered duplicative, the Court used the hypothetical of an injured husband and his (ostensibly non-injured) wife, noting that "a wife's claim that she is unable to engage in activities that she formerly enjoyed prior to her husband's injury, such as taking vacations, attending sporting events, or dancing, is compensated under loss of consortium and need not be compensated again under loss of enjoyment of life."[37]Id. (emphasis added).
This case does not present such a scenario. Here, Mr. Guillot was compensated by the jury for loss of enjoyment of life "as a consequence of his injuries," pursuant to the language on the jury verdict form (emphasis added). Thus, unlike the hypothetical posed by the Court in McGee, supra, the jury's award to Mr. Guillot was separate and independent from Mrs. Guillot's injuries, and resulted from his own injuries that he suffered in the accident-mental anguish and emotional distress.[38]
Finally, and perhaps most significantly, McGee ultimately held that "whether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and should be left to the district court's discretion on a case-by-case analysis." Id. at p. 12, 933 So.2d 770 (emphasis added). Considering the horrific nature of *195 the injuries suffered by Mr. Guillot, and the unusual and extraordinary facts and circumstances of this particular case, we find that the jury did not err in compensating Mr. Guillot for his loss of enjoyment of life as a consequence of his injuries.
Chrysler further argues that Lejeune damages[39] do not apply to witnessing an injury to a child in utero, noting that Civil Code Article 2315.6 provides for damages for parents and siblings viewing an event causing injury to another person.[40] Chrysler submits Civil Code article 26 provides that an unborn child born alive is a person, but only "for whatever relates to its interests." Therefore, Chrysler maintains, the Article 2315.6 action does not relate to the interests of the unborn child, because Article 2315.6 does not relate to the interests of the fetus, but rather to the interests of family members. Chrysler submits that the portion of the award to August and Madison Guillot for witnessing the injury sustained by Collin Guillot must be vacated; likewise, Juli Guillot's award for same must be vacated in its entirety. However, Chrysler does not challenge the award to August and Madison Guillot for witnessing the injury to Juli Guillot.
Considering Chrysler's argument with regard to the Lejeune damages, it is important to note, as Chrysler acknowledges, that La. Civ.Code art. 26[41] provides that an unborn child born alive is a person from conception. Article 2315.6 specifically provides that the mother, father, and siblings of the "injured person" may recover damages for witnessing the injury to the injured person. Collin Guillot was not only born alive, but was also alive for seventeen days, and was a natural person in utero. Accordingly, Wartelle v. Women's and Children's Hosp., Inc., 97-0744, pp. 10-13 (La.12/2/97), 704 So.2d 778, 784-85, disallowing an Article 2315.6 recovery on behalf of a stillborn fetus, is inapplicable to the facts of the instant case. Wartelle simply held that a stillborn fetus cannot be considered a "person" for purposes of Article 2315.6. Id. Therefore, we can find no error in the jury's award to August, Juli, and Madison Guillot for witnessing the injury to Collin Guillot.
*196 Chrysler further argues that because Juli Guillot subsequently gave birth to a healthy child, the jury's award for loss of ability to bear additional children is legally erroneous. We disagree. The record evidences that after the birth of her daughter, Blythe, Juli underwent a tubal ligation as a result of the severe damage and scarring to her reproductive organs from the accident.[42] Additionally, the jury heard extensive testimony with respect to the irreversible damage to Juli's reproductive organs as a result of the accident. An at-fault party must compensate the victim of a tort for all damages resulting from the act. McGee, 933 So.2d at 773. Therefore, we find that the jury's award for loss of ability to bear additional children was not manifestly erroneous or clearly wrong.

Assignment of Error # 7
In its final assignment of error, Chrysler argues that the jury awarded excessive general damages.
The well-settled standard of review for general damages is whether the trial court abused its discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). The trial court's discretion "is `great' and even vast, so that an appellate court should rarely disturb an award of general damages." Id. Although reasonable persons may disagree regarding an award of general damages in a particular case, "[i]t is only when an award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id. Only if an abuse of discretion is found will the reviewing court refer to prior awards, and then only for the purpose of determining the highest or lowest point within the court's discretion. Logan v. Brink's, Inc., 2009-0001, p. 13 (La.App. 4 Cir. 7/1/09), 16 So.3d 530, 540 (citing Riley v. Maison Orleans II, Inc., 2001-0498, p. 11 (La.App. 4 Cir. 9/25/02), 829 So.2d 479, 487). For a trial court to have abused its vast discretion, the award "must be so high or so low in proportion to the injury or fault that it `shocks the conscience.'" Id.
We do not find that the trial court abused its vast discretion with respect to the general damage award, nor do we find that the award shocks the conscience. It is indisputable that the unique facts of this case are extraordinarily tragic. Additionally, the Louisiana Supreme Court has held that "[t]he determination of the severity of mental anguish of distress resulting from the death of another is a fact question which depends upon several components, including, but not limited to, the closeness of the ties between the parties, the degree of love in the relationship, and the length of the relationship." Herbert v. Webre, 2008-0060, p. 8 (La.5/21/08), 982 So.2d 770, n. 7 (citing Hill v. Shelter Mut. Ins. Co., 05-1783 (La.7/10/06), 935 So.2d 691, 695). The record evidences that the Guillots testified as to the extreme anguish and emotional suffering associated with making the determination to end Collin's *197 life. Juli Guillot further testified that she and August held Collin as he died, and that, at their request, the nurses warmed up Collin's body so that his skin would not appear blue in the photographs they took after disconnecting Collin from the endotracheal tube and ventilator.
The Guillots' treating physician, Dr. Reynolds, also testified regarding his distinct recollection of the loving bond between the Guillots and their son Collin. Dr. Reynolds stated that he observed this bond and noted that in his general experience, the bond between parent and child is strengthened by technological innovations which allow parents to learn the sex of a child and thus choose names before birth, and to view ultrasound pictures that evidence the baby's appearance and features. As previously noted herein, an appellate court may not disturb a jury's finding of fact unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176.
Notably, the Louisiana Supreme Court recently reiterated the well-established principle that vast discretion is afforded to the factfinder in assessing the appropriate amount of both general and special damages, and is therefore entitled to great deference on review. Menard v. Lafayette Ins. Co., 2009-1869, pp. 7-9 (La.3/16/10), 31 So.3d 996, 1007 (citing Guillory v. Lee, 09-0075 at p. 14, 16 So.3d 1104, 1116; Wainwright v. Fontenot, 00-0492 at p. 6, 774 So.2d 70, 74). Accordingly, although a reviewing court may feel that its determinations are more reasonable, the Court emphasized that the trier of fact's conclusions should rarely be disturbed on review:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Id. (quoting Guillory, 09-0075 at p. 14, 16 So.3d at 1116-17; Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606).
The Court then articulated a two-step process for an appellate court reviewing a jury's determination regarding special damages:
An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Kaiser [v. Hardin], 06-2092 at pp. 11-12, 953 So.2d at 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Guillory, 09-0075 at p. 16, 16 So.3d at 1118; Kaiser, 06-2092 at p. 12, 953 So.2d at 810. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury's fact finding conclusion was a reasonable one. Rosell v. ESCO, 549 *198 So.2d 840, 844 (La.1989); Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973).
Id. at pp. 14-15, 31 So.3d 996 (emphasis in original).
Likewise, "[a]n appellate court on review must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." Id. at p. 15, 31 So.3d 996 (citing Rosell, 549 So.2d at 844). Based upon the record as a whole, we cannot say that the jury's determinations were unreasonable.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed.
AFFIRMED.
TOBIAS, J., concurs in part, dissents in part, and assigns reasons.
TOBIAS, J., Concurs in Part, Dissents in Part, and Assigns Reasons.
I agree with the majority that the doctrine of contra non valentem agere nulla currit praescriptio applies in this case. In my view, the facts support the application of the doctrine. A person such as Mr. Guillot would in almost all circumstances assume that he did not shift his automatic transmission into the "park" mode as he hurriedly left the vehicle to retrieve the cell phone that had been left inside the house. An ordinary person recognizes the excitement surrounding a woman entering labor and human nature directing speedy actions to get the woman to the health care provider for delivery of the child. Only when as a result of the newspaper reporter's inquiries were the plaintiffs' interests aroused that a defect in the automatic transmission and its gearshift lever may have been involved in causing the accident and injury did the prescriptive period commence to run.
I do, however, disagree with the majority's heavy reliance on cases dealing with medical malpractice to support the application of contra non valentem in this case. Medical malpractice cases are quite different from a products liability case such as the case at bar. A whole different line of jurisprudence has arisen to support contra non valentem in medical malpractice because of our statutory scheme addressing malpractice. Rather, I would reason from the specific facts of this case that adequately support the application of the doctrine for it is well-established in our jurisprudence that "[p]rescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action as long as such ignorance is not willful and does not result from his neglect." Young v. Clement, 367 So.2d 828, 830 (La.1979). The trial court was neither manifestly in error nor clearly wrong in finding that the plaintiff's case against the corporate defendants was not prescribed.
Although the preferred methodology in a jury case for handling a Daubert/Foret challenge to an expert's qualifications or opinion is a separate hearing rather than exposing the jury to the expert's possibly inadmissible opinion, I agree with the majority that the trial court's methodology is not reversible error. If an error exists in this case, it is harmless.
Likewise, I agree with the majority that the trial judge was well within his discretion in this case to admit evidence about other similar incidents involving Chrysler vehicles, recognizing the potential danger of prejudice and forcing and/or enticing Chrysler to explain how the other incidents were dissimilar and thereby needlessly expanding the length of the trial. *199 La. C.E. art. 403.[1] Further, I find no error in the trial court's admission of evidence that Chrysler's New Orleans counsel sent by facsimile transmission to Chrysler's Office of General Counsel a copy of the police report about the Guillots' accident. If anything, such practice demonstrates that Chrysler was concerned about the quality and safety of the vehicles that they manufactured; by receiving the reports of accidents nationwide, they would be in a better position to monitor whether a particular vehicle that they sold had a higher incidence of similar problems that could be corrected earlier. That a plaintiff's counsel could raise the inference that that the practice was somehow sinister is of no moment. It is a business practice, the evidence of which is admissible under the Louisiana Code of Evidence.
The assessment of one percent of the fault for the accident to Mr. Guillot by the jury is, however, an abuse of discretion, manifestly erroneous, and clearly wrong as a matter of law.
La. R.S. 32:145 states:
No person driving or in charge of any motor vehicle shall permit it to stand unattended without first stopping the motor, locking the ignition, removing the key, and effectively setting the brake thereon, and, when standing upon any grade, turning the front wheels to the curb or side of the highway.
This statute is generally applied to public highways and roadways and has no direct application to vehicles located on private property such as where the Guillots' vehicle was located when Mr. Guillot exited the vehicle leaving the engine running, the keys in the ignition, and the parking brake unset. However, the statute does express the legislature's view[2] of the danger of leaving unattended a vehicle with the engine running and the parking brake unset.
In Storey v. Parker, 13 So.2d 88 (La. App. 1st Cir.1943), the defendant, Mr. Parker, drove his automobile with an automatic transmission (a new technological innovation at the time) for servicing at a service station. He exited the vehicle, leaving the engine running, the vehicle in gear, and the parking brake unset in order to help his wife get out from the passenger seat. The car remained stationary for a few moments, but began to move forward after about a minute per the court's estimate. The moving vehicle struck and severely injured the plaintiff, Mr. Storey. The court concluded that the direct cause-in-fact (proximate cause at the time) of the accident "was the leaving of the control lever in high [in gear] by Mr. Parker while the motor was kept running and without the hand brake having been set." Id. at 94.
Storey, although somewhat dated by its age, expresses the duty of a person leaving a vehicle running and unattended on private property. La. R.S. 32:145 expresses the duty of a person on public property. The duty of the driver is the same. One does not leave a car running without in the very least setting the parking brake.
In this regard, it clear that Mr. Guillot was negligent; but no reasonable person could fix his comparative fault at a mere one percent. I find that the lowest percentage of fault that a factfinder could set Mr. Guillot's fault is at twenty-five percent and that is the percentage I would set in *200 this case. Accordingly, I would amend the jury verdict to increase Mr. Guillot's fault to twenty-five percent from one percent and adjust the quantum of damages accordingly.
I cannot agree that each plaintiff is entitled to $1,000,000 for the wrongful death of their infant son, Collin, who lived but 17 days. As a matter of law, our jurisprudence does not support that quantum; it is excessive, an abuse of discretion, manifestly erroneous, and clearly wrong.
The specific interrogatory answered by the jury read as follows:
Loss of Collin's love, affection and companionship and mental pain, suffering and distress resulting from Collin's death:
This interrogatory in the context of the entire jury interrogatory form asks the quantum of damages, if any, for Collin's wrongful death. A thorough quantum search of our jurisprudence reveals that the highest reported award for a "lost chance of survival," equivalent to a wrongful death in this case, for an infant (eight months old) is $550,000, but was reduced to $500,000 by virtue of the $500,000 damage cap in medical malpractice. Raines v. Columbia Lakeland Medical Center, 05-0243, pp. 5-7 (La.App. 4 Cir. 1/4/06), 923 So.2d 170, 173-74.[3] The Louisiana Supreme Court was never asked to review the Raines decision.
An award for wrongful death is low for a person of young age and gradually increases as one ages, where abilities and relationships can be determined and assessed. See, e.g., Anderson v. New Orleans Public Service, Inc., 572 So.2d 775, 777-78 (La. App. 4th Cir.1990), rev'd in part and affd in part, 583 So.2d 829, 833-34 (La.1991).
Under our current jurisprudence, I find based upon the Guillots' testimony that the highest award that a reasonable factfinder could award for the death of a 17-day old infant is $500,000, and I would set that amount in this case. I would reduce each of the $1,000,000 awards to $500,000, to be reduced further by the comparative fault attributable to Mr. Guillot addressed above.
Additionally, I cannot agree that Mr. Guillot is entitled to recover for both loss of consortium and loss of enjoyment of life as set forth in the jury interrogatories. The recovery is duplicative. McGee v. AC & S, Inc., 05-1036, pp. 12-13 (La.7/10/06), 933 So.2d 770, 779. The Supreme Court said, "allowing family members to recover for both their loss of consortium and their enjoyment of life would be duplicative and would not be authorized by La. C.C. art. 2315(B)." Id. And recovery for "the loss of enjoyment of life suffered by the primary victim's family members . . . is duplicative of their wrongful death claim." Id., p. 14, 933 So.2d at 780. We are required to reverse to zero Mr. Guillot's $200,000 award for loss of enjoyment of life.
La. C.C. art. 2315.6 states:
A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.

*201 B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article. [Emphasis supplied.]
This article is statutory authority for bystander or "Lejeune" damages. Per Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990), to recover bystander damages, (a) one must "either view the accident or injury-causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition . . .; (b) [t]he direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience . . .; (c) [t]he emotional distress sustained must be both serious and reasonably foreseeable to allow recovery,. . . going well beyond simple mental pain and anguish . . . [,]for the emotional injury . . . must be both severe and debilitating;" [and] (d) all claimants must have a close relationship with the victim. Id. at 570
Only an unborn child born alive is a person from the moment of conception "for whatever relates to its interests." La. C.C. art. 26; see also Wartelle v. Women's & Children's Hosp., Inc., 97-0744, pp. 12-13 (La.12/2/97), 704 So.2d 778, 784-85. It follows, therefore, that Mrs. Guillot's Lejeune damages cannot stand (being contained within other awards for damages by the jury). Further, a part of the damages to Mr. Guillot must be reduced to $200,000 as he did not witness actual injury to Collin, but rather only witnessed injury occurring to his wife. While I would not award Collin's sister, Madison, Lejeune damages for injury to Collin, I find the $50,000 set by the jury is an appropriate award under the circumstances for the emotional damages she sustained due to her witnessing injury to her pregnant mother. Thus in summary, I would reduce the awards of Lejeune damages to Mrs. Guillot to zero and to Mr. Guillot to $200,000, but maintain the Lejeune damages for Madison at $50,000, being the highest awards that our law will support on the facts of this case.
In all other respects, I agree with the majority's conclusions as the quantum of recovery to be reduced by the comparative percentage of fault of Mr. Guillot as I have found applicable above.
For the foregoing reasons, I respectfully concur in part and dissent in part from the decision of the majority.
NOTES
[1] Lamarque Dodge, Inc. was dismissed from the lawsuit.
[2] August Guillot testified at trial that he did not have a specific recollection of shifting the vehicle to park before exiting. Chrysler's expert Richard Keefer testified at trial that in Mr. Guillot's 2003 deposition, August stated that he recalled shifting to park.
[3] The Guillots never drove the Jeep again, and sold it shortly after the accident.
[4] After the 1% reduction, the awards totaled as follows: Juli Guillot, $2,747,250.00; August Guillot, $2,079,000.00; Madison Guillot, $123,700.00; and August and Juli jointly as the survival action for Collin, $79,200.00.
[5] Chrysler, LLC filed for bankruptcy on April 30, 2009; however, the bankruptcy court lifted the stay in order for the appeal to proceed.
[6] Appellees' assignments of error essentially mirror those of Appellant:

1.) The trial court did not err in finding this products liability action was not prescribed.
2.) The trial court did not err in the manner in which it conducted the lengthy Daubert hearing.
3.) The trial court did not err in admitting expert testimony and other evidence which assisted the jury in finding Chrysler manufactured a defective product which caused the accident, and showed the hidden nature of the defect to a consumer as contrasted with Chrysler's extensive knowledge of the cause and severity of the defect for a comparative fault assessment.
4.) The trial court did not err in admitting into evidence the faxed accident report which demonstrated Chrysler had knowledge of the accident shortly after it occurred and showed Chrysler was carefully tracking the Guillots' accident prior to it being reported to Chrysler.
5.) The jury did not abuse its discretion in allocating 99% of the fault to Chrysler and 1% to August Guillot.
6.) The trial court did not err in permitting the jury to consider damages to August Guillot for his loss of enjoyment of life, to all Plaintiffs for Lejeune damages for witnessing Collin's injuries, and to Juli Guillot for her lost ability to bear additional children, and Chrysler waived any error by failing to object to the verdict form prior to its submission to the jury.
7.) The jury did not abuse its discretion in its award of damages to the Appellees, and Chrysler has waived any objection to allegedly excessive general damages other than wrongful death damages by failing to brief the issue.
[7] Delictual claims must generally be asserted within one year of the date of the injury, and prescription commences on the date that the injury or damage is sustained. La. Civ.Code. Art. 3492.
[8] La. Civ.Code art. 3467.
[9] "Contra non valentem heralds from Roman law and has been passed down to us through our civilian roots." Hendrick v. ABC Ins. Co., 2000-2403, 2000-2349, pp. 9-10 (La.5/15/01), 787 So.2d 283, 289 (citing G. Baudry Lacantinerie & A. Tissier, Traite Theorique et Pratique de Droit Civil, Vol. XXVIII Nos. 364-79 (4th ed.1924), reprinted in 5 Civil Law Translations at 191-202 (La. St. Law Inst. Trans. 1972); Marcel Planiol, Traite Elemetaire de Droit Civil, Nos. 2697-2705(12th ed.1939), reprinted in Planiol Civil Law Treatise, Vol. 1, Part 2 at 593-98 (La. St. Law Inst. Trans. 1959)).
[10] In the context of a medical malpractice cause of action, the Louisiana Supreme Court has held that "[m]ere notice of a wrongful act will not suffice to commence the running of the prescriptive period." Guitreau v. Kucharchuk, 99-2570, p. 6 (La.5/16/00), 763 So.2d 575, 580. "[I]n order for the prescriptive period to commence, the plaintiff must be able to state a cause of action-both a wrongful act and resultant damages." Id. "Thus, even if a malpractice victim is aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to the treatment." Griffin v. Kinberger, 507 So.2d 821, 823-24 (La.1987).
[11] The four categories of contra non valentem are: (1) when there is a legal cause that prevented courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) when there is a condition coupled with the contract or connected with the proceeding that prevent the creditor from suing or acting; (3) when the debtor himself did some act that effectually prevented the creditor from availing himself of his cause of action; and (4) when the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Hendrick, p. 10, 787 So.2d at 290.
[12] "Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against every person who might have caused his damage." Guitreau, p. 6, 763 So.2d at 580.
[13] This Court noted that the 1989 New England Journal of Medicine article itself read as follows:

Although both medical publications and the popular press have discussed the risks of corneal ulceration infection in those who use soft contact lenses, estimates of the relative risks of using daily-wear as compared with extended-wear lenses have been speculative, and proposed risk factors have been based on uncontrolled studies. Institutional case series have described the spectrum of disease and its associated microbioloigic processes. However, with the exception of a case-control study devoted exclusively to acanthamoeba infections, there have been no controlled investigations.
Hoerner, 684 So.2d at 513.
[14] Mr. Guillot testified at trial that their driveway was flat.
[15] Lieutenant Jefferson Lee, Jr. of the St. Bernard Parish Sheriff's Office was questioned at trial regarding his investigation of the Guillots' accident and his conclusions regarding causation:

Q. And you concluded, I believe, you concluded ultimately that he was under the impression he must have just left the car in reverse?
A. Yes, sir, that's correct.
* * * *
Q. [August Guillot] repeatedly told you on initial questioning, I don't know, I don't know what happened?
A. That's correct, sir.
Q. So, ultimately, after the two of y'all  and I realize it was difficult for you to pull information out of him, but ultimately, he concluded and you agreed that he must have just left the car in reverse; otherwise, how else would it have gone backwards?
A. Correct.
* * * *
Q. Now. Lieutenant Lee, if you would have gone back to the Sheriff's Office and one of your colleagues or fellow officers would have been aware of this or some kind of way you got information that there was a park to reverse problem, what would you have done?
A. Oh, I would have immediately had that vehicle impounded and went through the proper channels to see if there were any defects in this vehicle that may have been related to this.
[16] The facts of this case are also distinguishable from both Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (1970), and Mistich v. Cordis Mfg. Co., 607 So.2d 955 (La. App. 4th Cir. 1992). Cartwright involved a plaintiff who was aware that his vehicle's brakes had failed at the time of his accident; similarly, the plaintiff in Mistich was aware of the defect in her pacemaker when it had to be replaced after only three years and the plaintiff had been advised that the pacemaker would last a lifetime. Furthermore, we find that Babineaux v. State through DOTD, 2004-2469 (La.App. 1st Cir. 12/22/05), 927 So.2d 1121, is inapplicable to the facts of the instant case. In Babineaux, the plaintiff admitted that she was aware on the date of the accident that her vehicle had hydroplaned from standing water on Highway 90. Additionally, a state trooper testified that the cause of the accident was due to standing water on the roadway; two witnesses provided similar statements. Therefore, the First Circuit concluded that the standing water on the highway was not hidden or undiscoverable, and plaintiff's claim that she did not discover her cause of action until she observed a billboard advising of a hydroplane hazard on Highway 90 lacked merit.
[17] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[18] This Court has also found no clear error where the trial court refused to conduct a Daubert hearing. Laura's Products, Inc. v. 600 Conti Street, LLC, 2007-0819, p. 11 (La. App. 4 Cir. 4/9/08), 982 So.2d 934, 940.
[19] Chrysler asserts that the fact that it is possible to intentionally misposition the gearshift was never contested by Chrysler.
[20] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403.
[21] Chrysler also argues that the court erred in allowing Appellees' expert, James Williams, to testify and corroborate Mr. Rosenbluth's conclusions, as Mr. Williams likewise intentionally mispositioned the gearshift.
[22] See also La.Code Evid. art. 703, Comment (d), which provides:

Under this Article the facts or data underlying the expert witness' opinion may properly be: (1) matters within his firsthand knowledge; (2) facts or data presented to him at trial, thus approving the use of hypothetical questions; and (3) under designated circumstances, facts or data not admissible in evidence (because, for example, their source is inadmissible hearsay), if they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinions or inferences. See 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 703[01] (1981). Whether the facts or data may be "reasonably relied upon" in this fashion is a question for the court under Article 104(A). See 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 703[03] (1984).
[23] Mr. Rosenbluth testified regarding his testing method of shifting in the spot between park and reverse rather than shifting naturally:

Q. Okay. Now, during a test if you wanted to, you could just sit there and you could just shift up onto the flat land where you think it is, and you could do that a thousand times, right?
A. Correct.
Q. Okay. So, instead of fishing around to find the spot where you want to see what the vehicle performance is, you could just throw it up there a thousand times and see what happened, right?
A. I probably would have been there three days doing that to get one time.
Q. Okay. And so, you could have done a natural shift and gotten this to occur, but you might have had to have tried for three days, right?
A. Correct.
[24] The admissibility of Mr. Williams' testimony is further discussed infra.
[25] Notably, Chrysler's expert, Mr. Keefer, also performed intentional manipulations with the gearshift in the same manner employed by Mr. Rosenbluth, and videos of same were played for the jury at trial. Mr. Keefer testified:

Q. Mr. Keefer, have you and your colleagues determined whether or not using the manipulation of the transmission control lever similar to what we have seen in the video from Mr. Rosenbluth, there are vehicles other than Grand Cherokees or vehicles with identical transmissions that can be caused to be positioned in a place where there can be after a period of time a self shift into reverse or a re-engagement of hydraulic reverse without the operator further touching the control?
A. Yes. We have done such evaluations.
Q. Have you done it on a number of vehicles?
A. Yes.
Q. There has been testimony that some of those vehicles were examined by Mr. Rosenbluth, and he was actually able to do a better job than you were in terms of inducing that phenomenon. Are you aware of that?
A. I am not aware of doing a better job, but various people can achieve mispositioning and re-engagement on a variety of vehicles; that's true.
[26] Brodtmann v. Duke, 96-0257, p. 13 (La. App. 4 Cir. 2/11/98), 708 So.2d 447, 455 (noting that "[t]o be relevant, the other accident should occur at substantially the same place, and under substantially the same conditions and must be caused by the same or similar defect, danger, act or omission").
[27] Mr. Rosenbluth testified that his Dodge truck had an identical transmission and a gear selector common to the Guillots' vehicle, and that he performed testing on his vehicle as well. In this instance, Mr. Rosenbluth inadvertently experienced a delayed engagement of reverse after putting his own vehicle in park:

It was probably the summer of '97. I had a '94 Dodge truck with this same transmission [as the Guillots'], and I was at my daughter's house. . . . I realized when I was leaving that I forgot my phone. So I pulled out of the parking spot and out in the middle of the street and I said, "I forgot my phone." I put it in park, or what I thought was park. I'm just going to run in and get my phone. I get out. I get to the back of the truck and realize I can't go around because the truck and I are now going the same speed. So I got back in the truck and put [my] foot on the brake and shifted it all the way into park. In the real world, it happened to me.
[28] The report was entitled, "Unintended Powered Roll-Away In Reverse After Parking  Jeep Grand Cherokee".
[29] With regard to Chrysler's argument that the OSIs in the form of customer complaints were inadmissible under Art. 801 as hearsay, we find that even if the OSIs were improperly admitted, it does not constitute reversible error. Admission of hearsay evidence is not reversible error where the record contains ample other evidence on which the trier of fact could base its findings. Williamson v. Haynes Best Western of Alexandria, 95-1725 (La.App. 4 Cir. 1/29/97), 688 So.2d 1201, 1241 (quoting Meadoux v. Hall, 369 So.2d 240, 245 (La.App. 4 Cir.1979), writ denied, 369 So.2d 1366 (La.1979)).
[30] The denial letters were submitted in connection with the corresponding customer complaints in which the Chrysler investigators were able to duplicate the delayed engagement of reverse on the vehicle. The letters generally advise the complainant that an inspection was performed on the vehicle in response to the complaint; that the inspection revealed no manufacturing defect or error in connection with the accident; and that Chrysler was unable to accept responsibility for the accident.
[31] La.Code Evid. Art. 803(8)(b)(i) provides as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(8) Public records and reports.
* * *
(b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel.
[32] When considering the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) the size of risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610 (citing Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 971 (La. 1985)).
[33] At the time of trial, Lt. Lee was retired.
[34] Mr. Guillot testified at trial regarding the mental anguish he suffered as a result of the accident, both with regard to the decision with Juli and their physician to remove Collin from life support, and in the days following Collin's death:

[Removing Collin from life support was] A decision no one should have to make. We had to make the decision to pull the plug on my little boy. And they said maybe, he would live, and maybe, he would die; but all my wife was praying for was for him to die, so he wouldn't suffer, because we knew he was brain dead, and that he would only be a vegetable. So she prayed, and we both prayed that when they took him off the ventilator that he would just die peacefully.
* * * *
Of course. My little boy. I would come home in the evenings, and my wife would be mourning for her little boy. That went on for a long time. . . . It goes on constantly. We're reminded of our little boy. You know, Juli explained everything in her testimony. Every time we go somewhere, every time, you know, we go hunting and that. Friends, they have little boys, and you know, it's a constant reminder that I will never have that opportunity to bring my little boy. There's always something missing.
You know, I have a lot to live for. I have a beautiful wife. I have a successful business. I have a wonderful mom, dad, family, and just recently, I'm wondering, I shouldn't be depressed. I have what every man would want. You know, just the past couple of month [sic] or years, it's just been, why am I depressed and, you know, from all this  now, I kind of know, it's that little boy in my life that's possibly missing that could be making me feel like this, because I'm forty years old now. I'm kind of through with all the hunting and the fishing and all that. I'm not as excited as I was before, and not to be able to see that through my little boy's eyes, to experience, to let him experience, you know, why I experienced.
Additionally, Lt. Lee testified at trial that he arrived at the hospital on the date of the accident to conduct an investigation and interview of Mr. Guillot, while Collin and Juli were being treated by physicians in the next room, witnessing Mr. Guillot's obvious emotional distress:
A. I proceeded to go upstairs to locate Mr. Guillot; and in this course, Mr. Guillot was standing there, and I believe his mother was there, and they were just tremendously distraught, crying. It was very emotional to stand there next to Mr. Guillot and look through a window and his baby was seizing right there, and I started to conduct my investigation as to what happened. . . .
* * * *
Q. You're interviewing him on the other side of a glass window where his child is being attended to by physicians?
A. Yes, sir. We were talking here, and the window was here, and his child was on the other side of the window being attended to by the physicians.
Q. His child was obviously in some type of distress?
A. Absolutely yes, sir.
Q. When you asked him  when you tried to get information from him, what did he tell you, Lieutenant Lee?
A. It was very difficult, because it was an emotional situation, I mean, he had his wife in critical condition in one hospital, and here he is with his child having seizures, and I'm trying to handle this as delicately as possible, because it was naturally a terrible thing, and I proceeded to question him about what had happened, and just the general information, and he, obviously, was crying. He was upset, he would run his hands through his hair and said I don't know. I don't know. We were in the driveway, I was getting ready to leave to go to the hospital to bring my wife. She said, it's time; let's go. He would just repeatedly say, I don't know. . . .
[35] See also Chappetta v. Bowman Transportation, Inc., 415 So.2d 1019, 1022 (La.App. 4th Cir.1982)(finding that wife of a tort victim could recover damages for emotional injuries even though she sustained no physical injuries; "when emotional injuries are proven by a preponderance of the evidence to exist and to have been caused by a negligent act, damages should be awarded for those injuries, even when they are not accompanied by physical injuries" and that "there is no reason to distinguish between physical injuries and independent emotional injuries and to award compensation for one but not for the other"). "Severe and debilitating emotional distress need not be proven by clinical diagnosis in order for a claimant to recover related damages." Dickerson v. Lafferty, 32,658, p. 3 (La. App. 2 Cir. 1/26/00), 750 So.2d 432, 434.
[36] Acknowledging that a loss of consortium claim is separate and distinct from the primary tort victim's claim, the Court found that, much like a wrongful death claim, "a loss of consortium claim . . . clearly compensates the beneficiaries for their own injuries, separate and distinct from the primary victim's injuries." McGee, p. 14, 933 So.2d at 780 (emphasis added).
[37] As previously noted, the husband/wife hypothetical was not representative of the fact pattern in McGee. In McGee, the Court reviewed a lower court's denial of a motion in limine which would have prevented plaintiffs from presenting a claim for loss of enjoyment of life. The plaintiffs were a widow and children of James Edward McGee, an individual who suffered injuries as a result of his exposure to asbestos and passed away on January 28, 2000. The widow and children brought wrongful death and survival actions against the defendants, who were Mr. McGee's former employers and manufacturers of various asbestos-containing products.
[38] The evidence presented at trial regarding the mental anguish and emotional distress Mr. Guillot suffered is described at length previously herein and also at notes 33 and 34, supra.
[39] Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La.1990)(damages are recoverable for mental pain and anguish suffered as a result of witnessing an event causing injury to another person).
[40] La. Civ.Code art. 2315.6 provides as follows (emphasis added):

A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
[41] La. Civ.Code art. 26 provides as follows:

An unborn child shall be considered as a natural person for whatever relates to its interests from the moment of conception. If the child is born dead, it shall be considered never to have existed as a person, except for purposes of actions resulting from its wrongful death.
[42] Juli testified at trial regarding her subsequent pregnancy, a high-risk pregnancy, and the tubal ligation she underwent after delivery:

Q. Are you able to have any other children?
A. I am not.
Q. Why is that?
A. When they went in to do the C-section my uterus was so twisted and scarred up that he didn't know how I got pregnant in the first place. He didn't know how I held the baby, kept the baby, but he had to tie my tubes so that I wouldn't get pregnant again, he said because I could die from it.
[1] C.E. art. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[2] Stated another way, it is the solemn expression of legislative will. La. C.C. art. 2.
[3] Raines was authored by the author of the majority opinion herein.